Patricia A. Howard sued her employer, Waffle House, Inc., on July 9, 1997, seeking to recover workers' compensation benefits for injuries she claimed to have sustained to her right elbow, arm, shoulder, and neck during the course of her employment with Waffle House. Following an ore tenus proceeding, the court entered an *Page 1125 
order on January 19, 2000, finding Howard to be 100% permanently and totally disabled. Waffle House appeals.
This case is governed by the 1992 Workers' Compensation Act. This Act provides that an appellate court's review of the standard of proof and its consideration of other legal issues shall be without a presumption of correctness. § 25-5-81(e)(1), Ala. Code 1975. It further provides that when an appellate court reviews a trial court's findings of fact, those findings will not be reversed if they are supported by substantial evidence. § 25-5-81(e)(2). Our supreme court "has defined the term `substantial evidence,' as it is used in §12-21-12(d), to mean `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Ex parte TrinityIndus., Inc., 680 So.2d 262, 268 (Ala. 1996), quoting West v. FoundersLife Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). This court has also concluded: "The new Act did not alter the rule that this court does not weigh the evidence before the trial court." Edwards v.Jesse Stutts, Inc., 655 So.2d 1012, 1014 (Ala.Civ.App. 1995).
Howard was employed at Waffle House as a relief manager on April 20, 1996; on that date she slipped and fell while removing supplies from the walk-in cooler. She testified that her head "snapped back" and that she hit her shoulder, elbow, and forearm as she fell to the floor. After the accident, she was treated at an emergency room for a fractured elbow and forearm.
Howard was seen by Dr. Danny R. Sparks, an orthopedic surgeon, on April 22, 1996, complaining of pain in her right shoulder. Dr. Sparks diagnosed Howard at that time with a "contusion sprain-type injury." Howard returned to Dr. Sparks on May 2, 1996, with continued complaints of pain in her shoulder and with pain in her neck that radiated into her shoulder and down into her arm. Dr. Sparks continued to follow Howard's condition; however, when her symptoms did not improve he ordered an MRI test and an arthrogram. The arthrogram revealed a tear of the rotator cuff. The MRI of Howard's cervical spine revealed a narrowing of the C5- 6 intervertebral disc space, with mild bony hypertrophic change and a mild anterior compression of the subarachnoid space at the C5-6 and C6-7 due to mild spondylosis. The MRI did not reveal a disc herniation or bulge at these levels.
Dr. Sparks operated on Howard on June 17, 1996, to repair the tear in her rotator cuff. Howard was placed in a physical-therapy program after the surgery; however, shortly after beginning the program, the pain in her shoulder returned. She testified that during this time she also experienced pain in her neck and that it was sometimes difficult to turn her head. Because of the pain in her shoulder, she developed a condition known as adhesive capsulitis, in which the shoulder freezes and does not move very well. Dr. Sparks performed a second surgical procedure on Howard's shoulder on September 27, 1996, to arthroscope the shoulder and to manipulate it while she was under anesthesia. Dr. Sparks determined that Howard's rotator cuff was intact and that it had apparently healed from the June 1996 surgery. Howard returned to physical therapy following this second surgical procedure; however, she still experienced pain in her shoulder. She was released to return to work in February 1997 on light duty with certain restrictions; however, her attempt to return to work was unsuccessful.
Dr. Sparks referred Howard for pain management in April 1997. This treatment was authorized by Waffle House and its workers' compensation insurance carrier. Howard was first seen by Dr. Walter *Page 1126 
Larisey on April 11, 1997; she was complaining of pain in the back of her neck and pain in her neck that radiated into her shoulder and down her arm, causing occasional numbness in her fingers. Dr. Larisey's exam revealed tenderness in Howard's shoulder, pain in the right trapezius muscle, and tenderness and crepitus over the spinous processes at C5 through C7 of the cervical spine. Dr. Paul Muratta,[1]
a pain-management specialist, testified that these symptoms were indicative of some injury to the cervical spine or irritation to the nerve roots in the cervical spine. Dr. Larisey's initial assessment of Howard indicated muscular spasm and tenderness in the trapezius muscle and possible cervical radiculopathy. Dr. Larisey injected Howard with an anesthetic in the trapezius muscle and she experienced relief from her pain; this caused Dr. Larisey to conclude that her pain might be associated with the cervical radiculopathy.
Howard returned to see Dr. Larisey on several occasions, complaining of pain in her neck that radiated into her shoulder. Dr. Larisey continued to treat Howard's pain with epidural steroid injections. Dr. Larisey noted that Howard experienced some pain relief from the injections. Dr. Muratta testified that the lessening of Howard's pain after the injections was indicative of some nerve-root irritation or inflammation in the cervical spine. Dr. Muratta also stated that, because Howard had experienced some relief from the injections, he felt her symptoms were related to problems with her cervical spine instead of her rotator cuff. Dr. Larisey noted on July 11, 1997, that Howard's cervical spine and neck were her primary problem.
Howard was first seen by Dr. Muratta on August 6, 1997. Dr. Muratta's physical examination of Howard on that date revealed a decreased range of motion in her cervical spine, as well as multiple trigger points[2]
in her trapezius muscle. Dr. Muratta treated Howard with a cervical epidural injection. Howard returned to Dr. Muratta on August 25, 1997; he noted at that time that Howard had tenderness over her cervical spine and trapezius muscle. He diagnosed her with neck pain with radiculopathy. Howard continued to be treated with cervical epidural injections by Dr. Muratta throughout the fall of 1997 for her neck and shoulder pain and her trapezius muscle pain.
Howard was referred back to Dr. Sparks in September 1997, by Dr. Muratta, for an evaluation of a possible herniated cervical disc. Dr. Sparks examined Howard and reviewed her medical records, including the earlier MRI he had ordered in May 1996, and he concluded that there was no herniated disc present in Howard's cervical spine and that her cervical spine complaints and symptoms were unrelated to her workplace accident. Dr. Sparks stated that he had nothing else to recommend for Howard and referred her back to Dr. Muratta.
Dr. Muratta recommended that Howard be referred to a neurosurgeon for a consultation. Howard was given a panel of four physicians, from which she chose Dr. R. Cem Cezayirli. Dr. Cezayirli examined Howard and ordered a myelogram and post- myelogram CT scan. The tests indicated that Howard had bone spurs in the neck at C5-6 and C6-7; however, Dr. Cezayirli concluded that the bone spurs were not contributing "much, if anything, to her *Page 1127 
problems in her right side." Dr. Cezayirli determined that Howard's primary problem was with her right shoulder and that there was nothing to offer her from a neurosurgical standpoint, and he suggested that she return to Dr. Sparks.
Howard continued to be seen by Dr. Muratta regularly for her complaints of neck pain that radiated into her right shoulder. She was seen by Dr. Muratta on June 15, 1998, complaining of an increase of the pain in her neck, which radiated into her shoulder and up her neck into her head, causing her to have headaches. Dr. Muratta noted severe tenderness in Howard's cervical spine at that time, as well as in the right trapezius muscle and shoulder joint. Dr. Muratta again treated Howard with a cervical epidural injection.
On June 22, 1998, Howard was seen by Dr. Muratta, complaining of an increase in her shoulder symptoms. Dr. Muratta noted severe tenderness in the shoulder joint as well as a separation of the shoulder joint over the previous surgical scar. Dr. Muratta also noted a decrease in the range of motion in the right shoulder joint. Dr. Muratta referred Howard for an orthopedic consultation and arthrogram. Waffle House and its workers' compensation insurance carrier authorized the arthrogram and consultation with an orthopedic surgeon.
Howard was first seen by Dr. Danny Michael, an orthopedic surgeon, on September 2, 1998. He noted at that time that the arthrogram ordered by Dr. Muratta indicated a full thickness rotator-cuff tear in Howard's right shoulder. Dr. Michael recommended surgery for Howard in order to repair the torn rotator cuff.[3] Dr. Michael operated on Howard on January 19, 1999, to repair the torn rotator cuff. He noted during the surgery some fraying of the rotator cuff tissue and a small hernia in the deltoid muscle. Dr. Michael stated that the hernia was probably the source of most of Howard's symptoms; however, he also noted that Howard had complained of "non-shoulder-related problems with her neck" that also were a source of her pain and that he was concerned with an overlap of her shoulder pain and cervical pain.
Dr. Michael continued to treat Howard after the surgery. He noted Howard's inability to move her shoulder and became concerned that she would develop adhesive capsulitis. Dr. Michael performed a manipulation of the shoulder while Howard was under anesthesia similar to the manipulation performed by Dr. Sparks in September *Page 1128 
1996. Howard was also complaining of an increase of pain in her shoulder; therefore, Dr. Michael ordered nerve-conduction studies to be completed in order to determine whether her pain was associated with a neurologic or disc problem in her neck. The nerve-conduction studies indicated the presence of carpal tunnel syndrome and ulnar-nerve neuropathy. Dr. Michael testified that the nerve-conduction studies also indicated that Howard had some cervical radiculopathy, which would explain her continued complaints of upper-extremity pain, and that the tests were indicative of an underlying pathology in the cervical spine. Dr. Michael testified that Howard could have possibly injured her cervical spine as a result of the workplace accident and that her complaints of pain since the accident could have been caused, in part, by an injury to her cervical spine. Dr. Michael stated that Howard had a lot of non-shoulder-related conditions or symptoms that were contributing to her condition, but that it was difficult to separate those from each other.[4]
Howard continued to be treated by Dr. Muratta after the surgery by Dr. Michael. She was seen by Dr. Muratta on March 26, 1999, with continued complaints of neck pain. Dr. Muratta noted tenderness in the cervical spine and continued to diagnose Howard with cervical spine pain with radiculopathy. Dr. Muratta testified that Howard's complaints of cervical spine pain with radiculopathy were separate from the problems associated with the torn rotator cuff and that a successful repair of the rotator cuff would not resolve the complaints Howard was having with her cervical spine.
Dr. Muratta agreed with Dr. Michael's assessment that the nerve conduction studies indicated an abnormality with Howard's cervical spine. Dr. Muratta testified that the studies indicated a medical pathology consistent with his objective findings. Dr. Muratta explained that the nerve conduction studies were consistent with cervical radiculopathy and abnormalities seen in the cervical spine and musculature. He also stated that the ulnar nerve neuropathy was indicative of an irritation of the cervical nerves. Dr. Muratta testified that Howard's workplace injury had caused the rotator-cuff injury to her shoulder and also had exacerbated the condition with her cervical spine.
Waffle House initially argues that Howard failed to prove by substantial evidence that her cervical-spine injury arose out of and in the course of her employment. We disagree. For an injury to be compensable, it must be "caused by an accident arising out of and in the course of" the employee's employment. § 25-5-51, Ala. Code 1975. The phrase "arising out of" an employee's employment requires a causal connection between the injury and the employment. Dunlop Tire RubberCo. v. Pettus, 623 So.2d 313 (Ala.Civ.App. 1993). The phrase "in the course of" the employee's employment refers to the time, place, and circumstances under which the accident occurred. Id. In accident cases, i.e., those involving a sudden and traumatic event, an employee must produce substantial evidence tending to show that the alleged accident occurred and must also establish medical causation by showing that the accident caused, or was a contributing cause of, the injury. Ex parteTrinity Indus., Inc., 680 So.2d at 266 n. 3. The trial court may find medical causation without testimony from medical doctors. Ex partePrice, 555 So.2d 1060 (Ala. 1989). *Page 1129 
The totality of the evidence, including both lay and expert testimony, may satisfy a showing of medical causation. U.S. Steel, A Divisionof USX Corp. v. Nelson, 634 So.2d 134 (Ala.Civ.App. 1993).
After carefully reviewing the record, we conclude that Howard presented substantial evidence indicating that her cervical-spine injury arose out of and in the course of her employment. She had had no complaints with her neck or cervical spine before her workplace accident; however, after the accident she complained of pain in her neck that radiated into her shoulder. Dr. Muratta diagnosed Howard with cervical neck pain with radiculopathy and treated her for over two years. The nerve-conduction studies performed on Howard substantiated Dr. Muratta's diagnosis and indicated an underlying pathology with the cervical spine. Dr. Michael testified that Howard's workplace accident could possibly have caused her cervical injury and that the cervical injury could, in part, be a cause of her complaints of pain after the accident. Dr. Muratta directly stated that the workplace accident had exacerbated Howard's cervical condition. We note that an employee must present more than mere possibilities that would serve to "guess" an employer into liability. Blue Water Catfish, Inc. v. Hall, 667 So.2d 110
(Ala.Civ.App. 1995). We further note that the accident need only contribute to the injury complained of and does not have to be the sole cause of the complained-of injury. Ex parte Trinity Indus., supra. In this case, the totality of the evidence presented, including the testimony of Dr. Michael and Dr. Muratta, is substantial evidence indicating that Howard suffered an injury to her cervical spine, which arose out of and in the course of her employment with Waffle House.Nelson, supra. Accordingly, the judgment is affirmed as to this issue.
Waffle House next argues that the trial court erred in requiring it to pay for the services rendered by Dr. Muratta for his treatment of Howard's cervical injury. Waffle House argues that Dr. Muratta and his predecessor, Dr. Larisey, were not authorized to treat Howard for the cervical-spine injury. Waffle House and its insurance carrier had previously authorized treatment for Howard by Dr. Muratta and his predecessor, Dr. Larisey; however, after Howard was released from the care of Dr. Michael and had returned to Dr. Muratta, Waffle House discontinued its authorization of care by Dr. Muratta. Dr. Muratta testified that it was never his intention to release Howard from his care or treatment regimen.
Howard again petitioned the court for immediate relief, as she did when Waffle House had previously refused to authorize treatment recommended by Dr. Michael. Waffle House responded, contending that it had the authority to withdraw the authority of Dr. Muratta to treat Howard and that Dr. Larisey and Dr. Muratta had never been authorized to treat Howard for a cervical injury. After a hearing on Howard's petition, the court entered the following order:
 "The court has attempted to carefully consider the arguments and authorities submitted. The court has not been able to find any case exactly on the issue before it. That issue seems to be: `Can the employer or its carrier refuse to let an injured employee return to a previous authorized physician when that physician, with no intent to discharge the employee from his care, refers the employee to an additional approved physician?' This court reasons that the employer cannot. The purpose of the medical provisions of the Act is to assure healing for the employee with physicians approved by the employer. The *Page 1130 Sunnyland Foods[, Inc. v. Catrett, 395 So.2d 1005
(Ala.Civ.App. 1980),] and City of Auburn [v. Brown, 638 So.2d 1339
(Ala.Civ.App. 1993)], cases cited by the plaintiff indicate that the employer cannot withdraw approval or dictate treatment once a provider has been approved. Surely a referral (for example) to a physician for a nerve conduction study or to an Radiologist for X-Ray and MRI studies are not grounds for the employer decertifying the approved treating physician. Here, the approved treating physician was Dr. Muratta. He referred her to another physician who could provide services Dr. Muratta could not perform, but which were apparently not expected to provide a `cure' of all of her symptoms and ailments. Medicine today is a team effort. It may well be that when the Act was passed the idea of one physician who treated everything[, w]ho diagnosed, read the X-rays, decided upon and performed surgery and then supervised follow up care was an acceptable view of medicine, but it is no longer. This court is of the opinion that the Act need not be construed with such a narrow view. The defendant is hereby ORDERED to provide services to Ms. Howard under Dr. Muratta's care."
We conclude that the trial court's order is well reasoned and consistent with the law of this state. Section 25-5-77(a), Ala. Code 1975, requires the employer to pay the actual costs of reasonably necessary medical expenses. Acustar, Inc. v. Staples, 598 So.2d 943
(Ala.Civ.App. 1992). Section 25-5-77(g), Ala. Code 1975, provides that an injured employee shall not be liable for the payment of any authorized and compensable medical expenses associated with a compensable compensation claim. Generally, an employer may not dictate to the employee whether he may have medical treatment recommended by the treating physician. City of Auburn v. Brown, 638 So.2d 1339
(Ala.Civ.App. 1993). Further, when an employer authorizes treatment for an employee by one physician and the employee is satisfied with the treatment provided by that physician, the employer loses its authority to withdraw its authorization for treatment by that physician. SeeSunnyland Foods, Inc. v. Catrett, 395 So.2d 1005 (Ala.Civ.App. 1980);G.C. Colyer Co. v. McAdams, 562 So.2d 1326 (Ala.Civ.App. 1990); Cityof Auburn, 638 So.2d 1339 (Thigpen, J., concurring in the result). Accordingly, we conclude that Dr. Muratta had previously been authorized to treat Howard, that the treatment he rendered was reasonable and necessary, and that once Waffle House gave authorization for that treatment it had no authority to withdraw the authorization.
We further find Waffle House's argument that authorization had not been given to Dr. Muratta and his predecessor, Dr. Larisey, for treatment of Howard's cervical injury to be without merit. Jackie Hogan, an employee of Waffle House's workers'-compensation-insurance administrator, testified that Dr. Muratta was an authorized treating physician; however, she stated that no treating physician had been authorized to treat Howard's cervical injury. Hogan testified that physicians forward to the insurance carriers their notes explaining treatment and that the treatment notes are reviewed to confirm that the suggested treatment is related to the injury. Hogan stated that treatment being provided to Howard was being paid for by the insurance carrier and that the carrier would have received bills from the medical providers as well as treatment notes explaining the services rendered.
The record suggests that Howard had complained of cervical neck pain which radiated into her right shoulder since the *Page 1131 
workplace accident. Dr. Larisey's initial treatment note indicated that she complained of neck pain radiating into her shoulder and that he gave an initial assessment of "possible cervical radiculopathy." Dr. Muratta's medical records indicate that he had diagnosed Howard with cervical neck pain with radiculopathy and treated her for her symptoms with cervical epidural injections for approximately two years before Waffle House attempted to withdraw its authorization for treatment. The record further suggests that Waffle House had authorized diagnostic testing of Howard's cervical complaints. Accordingly, the record clearly suggests that Waffle House had authorized treatment of Howard's cervical injury, and the court did not err in requiring Waffle House to pay for that treatment.
AFFIRMED.
Robertson, P.J., and Monroe and Crawley, JJ., concur.
Thompson, J., concurs in the result.
[1] Dr. Muratta took over Dr. Larisey's medical practice and, consequently, Howard's care.
[2] According to Dr. Muratta, "trigger points" are areas where muscle and tissue become irritated and "ball up," decreasing blood flow in the area.
[3] Waffle House refused to authorize the surgery recommended by Dr. Michael. Howard petitioned the trial court, requesting it to enter an order requiring Waffle House to authorize the surgery. Waffle House responded, raising as a defense the argument that the second rotator-cuff tear was not a recurrence of the original injury but a new injury.
Dr. Sparks testified that he had repaired the rotator-cuff tear in June 1996 and that the arthroscopic procedure conducted in September 1996 had indicated that the rotator cuff appeared to be healed. Dr. Sparks also testified that Howard's complaints of pain returned shortly after beginning a physical-therapy program following the initial surgery to repair the rotator cuff and that physical therapy and manipulation of the shoulder could precipitate a recurring tear of the rotator cuff. Dr. Sparks also stated that the rotator cuff could have failed to heal and that as time went on the sutures could have pulled loose.
Dr. Michael testified that it was his opinion that the rotator-cuff tear he was treating resulted from the original on-the-job injury. Dr. Michael stated that sometimes the rotator cuff can be poor tissue and simply fails to heal and ends up retearing. Dr. Michael also stated that post-surgical physical therapy could cause a subsequent tear in a rotator cuff. After conducting a hearing on the matter, the trial court entered an order approving the surgery recommended by Dr. Michael.
[4] Dr. Michael determined that Howard had reached maximum medical improvement with her shoulder.