866 So.2d 1158 (2003)
INTERNATIONAL PAPER COMPANY
v.
Raymond MELTON.
2010374.
Court of Civil Appeals of Alabama.
June 27, 2003.
*1160 Joseph T. Carpenter, Samuel M. Ingram, and Nathan C. Prater of Carpenter, Prater, Ingram & Mosholder, LLP, Montgomery, for appellant.
David Madison Tidmore of Cory, Watson, Crowder & DeGaris, P.C., Birmingham, for appellee.
MURDOCK, Judge.
International Paper Company ("International Paper") appeals from a judgment entered by the Dallas Circuit Court on December 11, 2001, that awarded Raymond Melton ("Melton") workers' compensation benefits based upon neck and back injuries, as well as injuries resulting from bilateral carpal tunnel syndrome, that arose out of and in the course of his employment with International Paper.
The trial court held an ore tenus hearing on October 30, 2001; the court heard the testimony of Melton and Edna Montgomery. Montgomery is a registered nurse; she was an employee of International Paper and handled workers' compensation claims for the company. The trial court also considered the following additional evidence: the deposition testimony and the relevant medical records of Dr. Swaid Swaid, a neurosurgeon; Dr. George Hill, an orthopedic surgeon; and Dr. Charles Lett, a general surgeon. The trial court also considered the relevant medical records of Dr. Zenko Hrynkiw, a neurosurgeon; Dr. W.S. Fisher, a neurosurgeon; Dr. John S. Kirkpatrick, an orthopedic surgeon at the Kirklin Clinic at University of Alabama in Birmingham; Dr. Laura Kezar, a rehabilitation physician at The WorkPlace, Inc.; Dr. Robert Curry, a psychiatrist; *1161 Thomas J. Boll, Ph.D.; Selma Family Medicine Center; and Vaughn Regional Medical Center.
At the time of the trial, Melton was 54 years old. In 1987, Melton was hired by International Paper as a forklift operator. Melton's job duties included, among other things, using his hands in a repetitive manner to operate the forklift. Melton testified that he worked 12- to 16-hour shifts, seven days a week. At the time of the trial, Melton continued to work as a forklift operator, earning as much or more than he had at the time of the work-related accidents.
The parties stipulated to a number of facts and to the issues to be decided by the trial court. Among other things, the parties stipulated that Melton had suffered neck and back injuries as a result of two on-the-job accidents occurring on April 7, 1997, and October 17, 1997, respectively. In each instance, Melton and another forklift operator collided; both collisions were "high impact in nature." The parties stipulated that the following doctors assigned the following impairment ratings to Melton: Dr. Swaid, 5% or less to the body for a neck fracture; Dr. Hill, 20% to the body; and Dr. Kezar, 5% to the body. Bob Simpson, a registered physical therapist with The Workplace, Inc., conducted a functional-capacity evaluation ("FCE") on Melton on May 4, 1998; pursuant to that FCE, Melton was authorized to return to work as a forklift operator with the following work restrictions: "occasional rest breaks to allow him to stretch and change positions to control his pain symptoms." Melton testified that International Paper was supposed to permit him to take a five-minute rest break each hour to stretch; however, he further testified that International Paper had not permitted him to take the rest breaks very often.
Melton was first diagnosed with carpal tunnel syndrome in January 1996. In August 1997, counsel for Melton notified International Paper that Melton was claiming that his carpal tunnel syndrome was work related. As a result of that correspondence, International Paper filed a "First Report of Injury" regarding Melton's carpal tunnel syndrome; however, International Paper's third-party administrator concluded that Melton's carpal tunnel syndrome was not work related. Thus, International Paper did not pay for Melton's medical expenses related to his carpal tunnel syndrome.
In its judgment, the trial court set out the issues that had been stipulated to by the parties:
"(1) Did [International Paper] receive timely notice of [Melton's] claim for carpal tunnel syndrome and
"(2) Were [Melton's] carpal tunnel complaints related to his job with [International Paper] and
"(3) The extent of permanent partial disability/physical impairment or loss of earning capacity of [Melton], if any, resulting from the accidents and/or injuries, and the amount of [workers'] compensation benefits which [Melton] is entitled to receive in this case, if any, and
"(4) Any medical expenses to which [Melton] may be owed which have not been paid by [International Paper]."
The trial court, after a very thorough summary of the testimony and evidence presented at the trial, found that Melton had given International Paper adequate and proper notice of his carpal tunnel syndrome; that Melton had proven by clear and convincing evidence that his carpal tunnel syndrome was work related; and that Melton had sustained a "physical impairment/permanent partial disability/loss of earning capacity" of 40% as a result of *1162 the work-related injuries. The trial court also ordered International Paper to pay Melton's past medical expenses related to his carpal tunnel syndrome. International Paper appeals.

Standard of Review
In a workers' compensation case, "[i]n reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence." § 25-5-81(e)(2), Ala.Code 1975; Ex parte Trinity Indus., Inc., 680 So.2d 262, 268 (Ala.1996) (holding that a trial court's finding of fact will not be reversed if that finding is supported by substantial evidence, i.e., if that finding is supported by evidence of "`such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved'" (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989))). Our review of legal issues shall be without a presumption of correctness; § 25-5-81(e)(1) provides that "[i]n reviewing the standard of proof set forth herein and other legal issues, review... shall be without a presumption of correctness."

Notice of Carpal Tunnel Syndrome
Citing § 25-5-78, Ala.Code 1975,[1] International Paper first contends that the trial court erred in finding that Melton gave adequate notice of his carpal tunnel syndrome.
Regarding this issue, the trial court found, in pertinent part:
"A[n] ... issue in this case involves when notice of [the carpal tunnel syndrome] claim was given to [International Paper]. [Melton] was first diagnosed with carpal tunnel syndrome by [n]eurosurgeon, Dr. W.S. Fisher on January 3, 1996 and testified that he gave notice to his employer some time after he was diagnosed with said condition when he was advised by his physician that such was work related. [Melton] also testified that he was suffering from carpal tunnel symptoms when he gave notice to [International Paper], at the time he filed his lawsuit and that he continues to have such symptoms presently while working for [International Paper]. [Melton] also testified that his carpal tunnel syndrome claim had been denied by [International Paper's] third party administrator and medical records from [n]eurosurgeon, Dr. Zenko Hrynkiw, dated July 14, 1997, indicate that [International Paper's] administrator would not approve a nerve test for such. Based upon said evidence that [Melton] reported said claim upon learning that it was work related, the ongoing nature of said carpal tunnel problem and the undisputed testimony that said claim was denied, the Court finds that [Melton] provided adequate notice to [International Paper].
"....
"Regarding the notice issue of [Melton's] carpal tunnel claim, the courts *1163 have held that the date of injury for cumulative trauma disorders such as carpal tunnel syndrome is the date of last exposure to the injurious job stimulation. Gattis v. NTN-Bower Corp., 627 So.2d 437, 438-39 (Ala.Civ.App.1993). Since [Melton] is currently still being exposed to such injurious stimulation and has previously given notice, written and verbal, ([Melton] testified he reported to [International Paper] and he has filed a verified complaint) the Court hereby finds proper notice was given regarding his carpal tunnel syndrome claim."
Although Gattis v. NTN-Bower Corp., 627 So.2d 437 (Ala.Civ.App.1993) (cited by the trial court in its judgment), involved the issue of when the statute of limitations begins to run on an employee's claim for workers' compensation benefits based on injurious exposure to chemicals, this court, in Dun & Bradstreet Corp. v. Jones, 678 So.2d 181 (Ala.Civ.App.1996), adopted the holding in Gattis for the purpose of determining the date on which the statute of limitations begins to run on claims involving cumulative-stress injuries, such as carpal tunnel syndrome. In Dun & Bradstreet, this court held:
"[I]n cases involving personal injury resulting from cumulative physical stress the date of the injury is the date of the employee's last exposure to the injurious job stimulation, for purposes of determining the date from which the limitations period begins to run on the employee's claim for workers' compensation benefits."
678 So.2d at 185. Moreover, in Zeanah v. Stewart Animal Clinic, P.C., 752 So.2d 505, 508 (Ala.Civ.App.1999), this court relied upon Dun & Bradstreet in concluding that, for purposes of the notice requirements under § 25-5-78, "[f]or accidents or occurrences involving cumulative-stress disorders, the date of the worker's last exposure to the stressor is considered the date of the injury."
Although International Paper attempts to factually distinguish Zeanah from the present case, what International Paper argues in actuality is that the application of the rule stated in Zeanah to the facts in the present case would create an unjust result. International Paper contends that there is no Alabama case on point. Apparently questioning how promptly after learning that his injury was work related Melton actually gave International Paper notice of that fact, International Paper requests this court to:
"interpret [§] 25-5-78 ... to require that, in cases of cumulative stress injuries when the employee continues employment with the employer which may be responsible for any such cumulative stress injury, that the date upon which the determination of whether notice is proper is based [on] the date the employee learns the he or she may have a work-related injury."
We decline to make that holding. We note that at the time of the trial Melton continued to be exposed to the injurious stressor (i.e., the repetitive nature of shifting gears and levers and steering in the operation of the forklift). Based on the facts of this case and our holding in Zeanah, supra, we conclude that the trial court did not err in finding that Melton gave International Paper adequate and proper notice of his carpal tunnel syndrome claim.[2]

*1164 Carpal Tunnel Syndrome

Next, International Paper contends that Melton failed to offer clear and convincing evidence that his carpal tunnel syndrome arose out of and in the course of his employment, i.e., that his carpal tunnel syndrome was "work related."
Section 25-5-51, Ala.Code 1975, provides:
"If an employer is subject to this article, compensation, according to the schedules hereinafter contained, shall be paid by the employer, or those conducting the business during bankruptcy or insolvency, in every case of personal injury or death of his or her employee caused by an accident arising out of and in the course of his or her employment, without regard to any question of negligence."
Section 25-5-1(9), Ala.Code 1975, defines "injury" as "includ[ing] physical injury caused either by carpal tunnel syndrome disorder or by other cumulative trauma disorder if either disorder arises out of and in the course of employment." Because carpal tunnel syndrome is a "cumulative physical stress disorder," an employee seeking benefits based on that disorder must present clear and convincing evidence indicating that his carpal tunnel syndrome arose out of and in the course of his or her employment. § 25-5-81(c), Ala. Code 1975;[3]Ex parte Russell Corp., 725 So.2d 264, 266 (Ala.1998); Thompson v. Akzo Nobel Indus. Fibers, Inc., 796 So.2d 375 (Ala.Civ.App.2001). Section 25-5-81(c) defines "clear and convincing evidence" as:
"evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
Regarding Melton's carpal tunnel syndrome, the trial court found, in pertinent part:
"[Melton] has worked long hours/extended shifts with [International Paper,] often 6 to 7 days per week. [Melton's] job duties as a forklift operator included gear and lever shifting, steering, etc. and were clearly repetitive in nature. At trial, [Melton] testified as to having... numbness and pain in his hands, ... causing him problems at work.

*1165 "....
"Regarding [Melton's] claim for bilateral carpal tunnel syndrome the Court notes the following testimony of the physicians who testified in this case. Specifically, [n]eurosurgeon, Dr. Swaid Swaid, testified that diagnostic testing had indicated that [Melton] had left carpal tunnel syndrome; that [Melton's] carpal tunnel syndrome was possibly caused by his forklift duties; and that such forklift duties could have aggravated any pre-existing condition [Melton] had regarding carpal tunnel syndrome.
"Orthopedic [s]urgeon, Dr. George Hill, also testified that [Melton] had diagnostic testing which indicated that he had carpal tunnel syndrome and he believed that driving a forklift could cause carpal tunnel syndrome; and that such forklift driving probably was a contributing factor to [Melton's] carpal tunnel syndrome.
"General [s]urgeon, Dr. Charles Lett, also testified that he had diagnosed [Melton] with hand pain and hand numbness; that [Melton's] work activities were contributing factors to his carpal tunnel syndrome; [and] that his work activities had aggravated his carpal tunnel syndrome.
"Also, the medical records in evidence indicate and the Court finds that [Melton] had the following carpal tunnel syndrome treatment. On January 3, 1996, [Melton] was first diagnosed with carpal tunnel syndrome by [n]eurosurgeon, Dr. W.S. Fisher. On July 14, 1997, [n]eurosurgeon, Dr. Zenko Hrynkiw, ordered another nerve test to confirm or rule out Dr. Fisher's finding but such was not approved by [International Paper's] [workers'] compensation administrator. On September 19, 1997, Dr. Fisher diagnosed [Melton] as having bilateral carpal tunnel syndrome and put [Melton] in a hand splint. On October 28, 1997, November 25, 1997 and February 13, 1998, [g]eneral [s]urgeon, Dr. Charles Lett, noted [Melton's] carpal tunnel syndrome condition. On May 4, 1998, [r]ehabilitation [p]hysician, Dr. Laura Kezar, noted [Melton's] diagnosis of carpal tunnel syndrome but stated such was not related to work injury. On November 4, 1998, and December 7, 1998, Dr. Lett noted [Melton's] carpal tunnel symptoms and on December 17, 1998, completed a form stating that [Melton's] work as a forklift driver was a contributing factor to [Melton's] carpal tunnel syndrome. On January 7, 1999, [Melton] was referred to [o]rthopedic [s]urgeon, Dr. George Hill, by Dr. Lett, who noted [Melton's] carpal tunnel complaints and that a recent EMG [electromyography] was negative for carpal tunnel syndrome. On January 12, 1999 and June 21, 1999, [Melton] again saw Dr. Lett with carpal tunnel syndrome complaints including numbness. On November 22, 1999, [Melton] returned to Dr. Hill who noted his complaints of right hand weakness, left arm and hand numbness. On December 8, 1999, an EMG nerve test at HealthSouth indicated that [Melton] had minimal left carpal tunnel syndrome. Another EMG test performed at UAB Hospital on September 4, 2001 was negative for carpal tunnel syndrome. Upon review of all the evidence in this case, the Court finds by clear and convincing evidence that [Melton's] work with [International Paper] caused and was a contributing factor to [Melton's] carpal tunnel syndrome condition."
Citing United Defense, L.P. v. Willingham, 829 So.2d 771 (Ala.Civ.App.2002), International Paper argues that (1) because there was conflicting evidence as to whether Melton's carpal tunnel syndrome was work related and (2) because none of the doctors testified that they were certain *1166 that Melton's job caused his carpal tunnel syndrome, Melton failed to clearly and convincingly prove that his carpal tunnel syndrome was work related. International Paper argues that the present case is remarkably similar to Willingham; in Willingham, this court reversed the trial court's judgment and held:
"We conclude that the employee did not present clear and convincing evidence that her carpal tunnel syndrome was work-related. Dr. Henry Ruiz, a neurosurgeon who treated the employee, testified that the employee's job duties, which included operating a drill press, could possibly cause carpal-tunnel syndrome. Dr. Kenneth Pilgreen, another neurologist who treated the employee, testified that the employee's job duties could cause carpal tunnel syndrome. Dr. Victoria Masear, an orthopedic surgeon who performed a carpal-tunnel release surgery on the employee, testified that the employee's condition was not work-related. Dr. Gordon Kirschberg, a neurologist who did not treat the employee but who reviewed some of her medical records, testified that her carpal tunnel syndrome was not work-related. This court has held that evidence indicating that an employee `might have had' or `possibly had' a work-related injury does not meet the clear-and-convincing evidence standard when there is conflicting testimony indicating that the employee's injury was not work-related. Oden v. Gulf States Steel, Inc., 797 So.2d 1093, 1094 (Ala.Civ.App.2001). Therefore, we conclude that the trial court erred by finding that the employee proved by clear and convincing evidence that her carpal tunnel syndrome was a work-related injury.
"We also conclude that the employee did not present clear and convincing evidence that her fibromyalgia is work-related. Dr. Vishala Chindalore, a specialist in rheumatology, testified that the employee's fibromyalgia is possibly work-related. Dr. Pilgreen testified that in his opinion the employee's carpal tunnel syndrome caused her fibromyalgia. As stated above, we have concluded that the employee failed to present clear and convincing evidence that her carpal tunnel syndrome is work-related. Therefore, we conclude that the trial court erred by finding that the employee presented clear and convincing evidence that her fibromyalgia is work-related."
829 So.2d at 772-73.
In a special writing concurring in the result in Willingham, the author of this opinion noted:
"Oden v. Gulf States Steel, Inc., 797 So.2d 1093 (Ala.Civ.App.2001), was a case in which this court affirmed the judgment of the trial court after an ore tenus proceeding. Despite that potentially significant difference, see Oden, 797 So.2d at 1094-95 (Murdock, J., concurring specially), under the particular evidence presented in this case, I concur in the result reached by the majority."
Willingham, 829 So.2d at 773-74 (Murdock, J., concurring in the result).
International Paper refers this court to certain medical testimony and medical records, attempting to analogize the facts in this case to the facts in Willingham. International Paper quotes from the deposition testimony of Dr. Swaid, Dr. Lett, and Dr. Hill; in each of the quoted excerpts, the doctor testified that Melton's job as a forklift operator "could have" caused Melton's carpal tunnel syndrome. International Paper further quotes Dr. Hill's deposition testimony where he testified that Melton's job as a forklift operator "probably" was a contributing factor to Melton's carpal tunnel syndrome. International Paper also quotes an excerpt from Dr. Kezar's *1167 medical records where she noted on May 4, 1998, "[c]arpal tunnel syndrome by previous nerve conduction studies, not related to work injury."
At the outset, we note that International Paper's summary of medical testimony fails to recount the portion of Dr. Lett's testimony that supported the trial court's finding that "Dr. Charles Lett testified that ... [Melton's] work activities were contributing factors to his carpal tunnel syndrome; [and] that his work activities had aggravated his carpal tunnel syndrome":
"[COUNSEL FOR MELTON]: Doctor, that's a letter that I wrote you back in December of 1998.[[4]] And in that letter I ask you whether or not his work operating a forklift was a contributing factor to his Carpal Tunnel Syndrome. At that time you replied your opinion was that it was. Was that your opinion at that point in time?
"....
"[DR. LETT]: Yes, sir.
"[COUNSEL FOR MELTON]: And do you have an opinion today to the same question?
"[DR. LETT]: I don't see any reason it hasn't changed. Forklift driver work activity could be causative and can be a contributing factor for Carpal Tunnel Syndrome.
"[COUNSEL FOR MELTON]: And is that your opinion today.
"[DR. LETT]: Yes."
We do not read our holding in Willingham as requiring this court to conclude, as a matter of law, that in each and every case where the trial court's record includes conflicting medical evidence on the issue of whether an employee's carpal tunnel syndrome is work related, including some medical evidence that the employee's carpal tunnel syndrome was not work related, that the employee has failed to present clear and convincing evidence that the injury was work related. To do so would be to improperly intrude on the trial court's role as fact-finder. Not only might the trial court choose, in an appropriate case, to give greater weight to contrary medical evidence (e.g., the testimony of one or more physicians who opine that the employee's injury did arise out of his work), it also might, in an appropriate case, give weight to the lay testimony presented, including that of the employee himself. As this court stated in Goodyear Tire & Rubber Company v. Snell, 821 So.2d 992, 997 (Ala.Civ.App.2001):
"The trial court may find medical causation without testimony from medical doctors. Ex parte Price, 555 So.2d 1060 (Ala.1989). The totality of the evidence, including both lay and expert testimony, may satisfy a showing of medical causation. U.S. Steel, A Div. of USX Corp. v. Nelson, 634 So.2d 134 (Ala.Civ.App. 1993). Further, it is well settled that a conflict in the evidence as to medical causation in a workers' compensation case presents an issue of fact to be determined by the trial court, and not by the appellate courts of this state. ATEC Assocs., Inc. v. Stewart, 674 So.2d 1296 (Ala.Civ.App.1995)."
We note that "§ 25-5-81(c) does not require proof to an absolute certainty, but rather requires only clear and convincing proof." Wal-Mart Stores, Inc. v. Kennedy, *1168 799 So.2d 188, 197 (Ala.Civ.App. 2001). In Wal-Mart, this court affirmed the judgment of the trial court, noting that the following testimony established that the employee's carpal tunnel syndrome arose out of and in the course of her employment:
"`Q. Was the carpal tunnel related to the accident in the sense that it developed as a result of her having to use the tremendous pressure on the walker trying to walk around?
"`A. I can't say that with absolute certainty, but I believe since she had not complained of carpal tunnel symptoms before, and she was relegated to a walker or cane, and then developed the symptoms, that probably contributed to her carpal tunnelI mean, for that surgery. It was combined with a [three month] period of either using a walker or cane.'" 799 So.2d at 197 (emphasis added).
We acknowledge that in some cases involving carpal tunnel syndrome, such as the one before us, the only honest testimony that a doctor can give is that, in his or her opinion, the carpal tunnel syndrome "could have been" or "probably was" work related; to require a doctor to give a more certain conclusion regarding medical causation in such instances would be to encourage employees to find a doctor who would be willing to be less than truthful, and, ultimately, only those employees who were able to find such a doctor could prevail. Further, the fact that there is conflicting medical evidence regarding the issue of whether an employee's carpal tunnel syndrome is work related should not automatically render the evidence before the trial court to be less than clear and convincing. The resolution of conflicting evidence as to medical causation is to be determined by the trial court, not the appellate courts. Goodyear, supra.
In cases involving "cumulative-stress" carpal tunnel syndrome, the employee must present clear and convincing evidence tending to show that the stressor, i.e., the repetitive nature of the job in the present case, was at least a contributing cause of the injury. See Ex parte Trinity Indus., Inc., 680 So.2d 262, 266-67 (Ala. 1996); see also B E & K, Inc. v. Weaver, 801 So.2d 12, 18 (Ala.Civ.App.2000). Based on the particular medical testimony presented in this case, as well as the testimony of the employee himself, which tended to support the trial court's findings, we cannot conclude that the trial court did not have before it sufficient evidence from which it could reasonably find that Melton presented clear and convincing evidence that his carpal tunnel syndrome was work related.

Permanent Partial Disability
Next, International Paper contends that the trial court erred in finding that Melton suffered a 40% disability. Regarding that finding, the trial court found, in pertinent part:
"At trial, [Melton] testified as to having chronic neck and back pain, numbness and pain in his hands, with all of such causing him problems at work.
"....
"Prior to [Melton's] on the job forklift accidents with [International Paper], [Melton] apparently had sustained neck and back injuries similar to those he claims in this case, having been involved in a couple of motor vehicle accidents. Such findings are based on [Melton's] testimony and the medical records from Dr. Robert Curry, Dr. W.S. Fisher, Selma Family Medicine[,] and the Kirklin Clinic. After his forklift accidents, [Melton] was diagnosed as having neck pain, back pain radiating into his leg, *1169 bulging disks in his neck with nerve root compression, a fracture in his neck at the C7-T1 vertebrae, and bulging disks in his back.
"Specifically, the Court finds that [Melton] was diagnosed as having a low back injury on April 9, 1997 by Selma Family Medicine after an accident at work on April 7, 1997. [Melton] was then referred to [n]eurosurgeon, Dr. W.S. Fisher who noted on April 25, 1997, that [Melton] had back discomfort and numbness. On May 23, 1997, Dr. Fisher diagnosed [Melton] with right S1 radiculopathy multiple bulges at L5-S1, L4-5 and L3-4, multiple cervical disk bulges and cervical spondylosis. Dr. Fisher continued to treat [Melton] and on June 20, 1997, returned [Melton] to work with no restrictions. On July 7, 1997, [Melton] was evaluated by [n]eurosurgeon Dr. Zenko Hrynkiw, who diagnosed lumbar radiculopathy. Dr. Hrynkiw put [Melton] on light duty and saw him again on July 14, 1997, noting that [Melton] had an EMG/NCV test that allegedly indicated he had right carpal tunnel syndrome. On this date, Dr. Hrynkiw requested another EMG/NCV study to rule out carpal tunnel syndrome but [International Paper's] third party administrator would not approve such. [Melton] next returned to Dr. Fisher on September 19, 1997, who diagnosed him as having bilateral carpal tunnel syndrome and put him in a hand splint. On October 7, 1997, [Melton] was seen by [g]eneral [s]urgeon, Dr. Charles Lett, who noted [Melton] was complaining of pain and numbness in his hands and that [Melton] was a forklift driver, and that he had sustained a wrist injury 4-5 years earlier. On October 16, 1997, [Melton] was referred to [o]rthopedic [s]urgeon, Dr. John Kirkpatrick, who diagnosed [Melton] as having a degenerative disk disease of the lumbar spine and stenosis at the L4-5 and 5-1 levels. Dr. Kirkpatrick also noted that there was evidence of an acute traumatic injury and that his degenerative disk disease had been aggravated by his injuries.
"On October 22, 1997, [Melton] was treated by Selma Family Medicine for neck pain after a forklift accident on October 17, 1997. X-rays on such date indicated displacement or misalignment of his C7-T1 vertebrae in his neck. On November 4, 1997, [Melton] returned to Selma Family Medicine and was instructed to follow up with a neurosurgeon. On November 25, 1997, [Melton] saw Dr. Lett who advised [Melton] not to perform heavy lifting. On December 11, 1997, [Melton] was referred to [n]eurosurgeon Dr. Swaid Swaid, who noted right side cervical pain, left arm numbness and pain, lumbar pain and leg weakness, and said the pain was due to work injury. On December 18, 1997, [Melton] had a CT scan of his neck which indicated a fracture at the C7 level and evidence of subacute injury. Dr. Swaid, on January 2, 1998, noted [Melton's] problems were non-surgical and returned him to work. [Melton] returned to see Dr. Kirkpatrick on January 27, 1998 and March 19, 1998, who noted neck and back pain and recommended referral to Dr. Laura Kezar, a rehabilitation physician. On March 1, 1998, [Melton] was evaluated by Dr. Laura Kezar at The WorkPlace, who noted that [Melton's] chronic symptoms were exacerbated by his work-related injuries. [Melton] returned to Dr. Kezar on May 4, 1998, and at such time was diagnosed as having chronic neck pain, chronic low pain with SI joint dysfunction and SI adiculopathy, carpal tunnel syndrome not related to work injury. Dr. Kezar also noted that [Melton] *1170 had a total permanent physical impairment of 5% to the body for symptoms caused or contributed to by the work related injury and that he was at maximum medical improvement (MMI). Dr. Kezar also recommended that [Melton] be allowed rest breaks at work to stretch and change positions to help control his pain symptoms. On June 15, 1998, [Melton] returned to Dr. Kezar for his chronic neck and back pain and recommended that he get a local physician to follow him and refill his prescriptions. On June 19, 1998, [Melton] had a MRI scan which indicated bulging disks at L4-5 and L5-S1 in his back. On September 2, 1998, [Melton] returned to Dr. Kezar, for his chronic neck and back pain and was given another work slip reiterating the importance of him being allowed work breaks for stretching. On January 15, 1999, [Melton] returned to Dr. Kezar who diagnosed [Melton] as having an exacerbation of chronic neck pain. On April 26, 1999, [Melton] was seen by [o]rthopedic [s]urgeon Dr. George Hill who noted that [Melton's] numbness may be related to his neck. On May 5, 1999, an MRI of [Melton's] neck revealed cervical spondylosis, anterolistheses at the C7 level with compression of the thecal sac, and disks at C4-5 and C5-6 levels with compression of the thecal sac. On August 11, 1999, [Melton] returned to Dr. Kezar who diagnosed [Melton] with acute exacerbation of chronic mechanical low back pain with SI joint dysfunction and noted that [Melton] reported such was due to [International Paper's] non-compliance with the work restrictions assigned by Dr. Kezar. Dr. Kezar continued [Melton's] 5 minute rest breaks per hour restrictions. On November 22, 1999, [Melton] returned to Dr. Hill complaining of problems with his neck and arm, right hand weakness and left arm/hand numbness. Dr. Hill ordered a myelogram and CT scans and a nerve conduction study. On December 8, 1999, [Melton] had such tests performed at HealthSouth, the Myelogram and CT scans indicated that [Melton] had a large bony ventral defect at the C7 level in his neck with nerve root compression, and other defects at C3-4, C4-5, C5-6 and C6-7 levels. On January 20, 1999, Dr. Hill completed a form indicating that [Melton's] forklift accidents caused or were contributing factors to his neck and back problems. On April 5, 2001, [Melton] returned to [g]eneral [s]urgeon, Dr. Charles Lett who noted [Melton] was complaining of numbness in his feet and that he worked as a forklift driver. On April 26, 2001, [Melton] had neck X-rays done at Vaughn Regional Medical Center which indicated [Melton] had multiple levels of bulging disks and misalignment of the vertebrae at the C7 level. On September 27, 2001, [Melton] returned to Dr. Kezar, who noted [Melton's] chronic neck pain, left hand numbness, chronic low back pain and sacroiliac joint dysfunction.
"At trial, [n]eurosurgeon, Dr. Swaid Swaid testified that he treated [Melton] on two occasions, on December 11, 1997, and on January 21, 1998. Dr. Swaid diagnosed [Melton] as having a small fracture in his neck at the C7 level that did not require surgery at such time but said surgery in the future was possible. Dr. Swaid also testified that Melton had multiple disk bulges in his neck and low back, and that MRI, Myleogram and CT scans had indicated that Melton had a large bony defect in his neck at C7-T1, compression of the nerve root at the same level, and some spurring as well. Dr. Swaid further testified that Melton had a permanent physical impairment of 5% or less in his neck due to the fracture;

*1171 that bulging disks can be painful; that trauma causes calcium deposits to form on the vertebrae creating spurring that can be painful; that in his opinion the forklift accidents were contributing factors to [Melton's] back and neck pain; that said accidents and forklift duties could have aggravated any pre-existing conditions that may have been present in Melton's back or neck.
"Furthermore at trial, [o]rthopedic [s]urgeon, Dr. George Hill testified that Melton had been referred to him by [g]eneral [s]urgeon, Dr. Charles Lett. Dr. Hill testified that he saw Melton on several occasions and an MRI and Myleogram indicated him as having several disk[s] bulging against his spinal cord in his neck and back, bone spurring in his neck, and at the C7-T1 level in his neck, he had a big problem as the bone had slipped backwards causing nerve root compression. Dr. Hill testified that he recommended surgery for such condition; that the forklift accidents were contributing factors to his neck and back problems; that Melton had a 20% permanent physical impairment rating; that his forklift accidents probably aggravated Melton's pre-existing neck and back problems; that Melton would have permanent restrictions from said conditions; and that without neck surgery Melton's condition would stay the same or get worse in the future.
"Also, [g]eneral [s]urgeon, Dr. Charles Lett testified that he had treated ... Melton since October 7, 1997, and had diagnosed him as having back pain and neck pain.
"Also, on September 27, 2001, just over a month before trial, [r]ehabilitation [p]hysician Dr. Laura's records indicate that it was her impression [Melton] was having chronic neck pain, left hand numbness, chronic lower back pain, and sacroiliac joint dysfunction.
"Based upon the foregoing, the Court finds that [Melton's] forklift accidents caused and/or were contributing factors to Melton's current neck and back condition.
"....
"Regarding [Melton's] claim for work injury related depression, the Court finds that [Melton] was first diagnosed as having major depression approximately 6 weeks after his first on the job accident on May 26, 1997, by Dr. Thomas J. Boll. [Melton's] treatment for depression has been primarily by [g]eneral [s]urgeon, Dr. Charles Lett, who diagnosed [Melton] as having depression as well and testified that [Melton] was having problems sleeping on December 7, 1998, and June 21, 1999. Based upon said evidence, the Court finds [Melton's] work accident injuries and carpal tunnel syndrome to be contributing factors to his depression.
"....
"Regarding the extent of permanent partial disability/physical impairment or loss of earning capacity, in this case [Melton] has returned to his job at the same or higher wage and is therefore, limited to his physical impairment. [Ala.Code 1975,] § 25-5-57(a)(3)(i). Regarding a claimant's physical impairment, the trial court is not bound by any physician's impairment rating and is free to evaluate the employee's injury independently and may arrive at a physical impairment based upon all the available evidence. Compass Bank v. Glidewell, 685 So.2d 739 (Ala.Civ.App.1996). Therefore, based on the testimony of [Melton], which the court finds credible, observations by the Court of [Melton] while in the courtroom, the medical evidence and all trial testimony, the Court hereby finds that [Melton] has sustained *1172 a physical impairment/permanent partial disability/loss of earning capacity of 40%."
In the present case, three doctors assigned physical impairment ratings. As previously stated, the following doctors assigned the following impairment ratings to Melton: Dr. Swaid, 5% or less to the body for a neck fracture; Dr. Hill, 20% to the body; and Dr. Kezar, 5% to the body. From our review of the record, it is apparent that Dr. Swaid's and Dr. Kezar's impairment ratings did not include Melton's carpal tunnel syndrome. Likewise, based on our review of Dr. Hill's deposition testimony, it appears that Dr. Hill only took into consideration Melton's neck problems in assigning Melton a 20% impairment rating. Even if Dr. Hill's impairment rating had included Melton's carpal tunnel syndrome, the trial court was still not bound to adopt that rating. Glidewell, 685 So.2d at 741. The trial court also considered Melton's testimony and observed his demeanor at the trial and found him to be credible. Melton testified that he had neck and back pain while he worked and that he was prohibited from taking pain medicine and operating a forklift at the same time. Melton also testified that he had problems with gripping; problems with numbness and tingling in his hands; and problems sleeping, which the medical evidence revealed contributed to his depression.
We also note that the trial court's finding of 40% "impairment/permanent partial disability/loss of earning capacity" was based, in part, on the trial court's resolution of conflicting evidence in favor of Melton regarding the issue of whether Melton's carpal tunnel syndrome was work related. The trial court also found that Melton's carpal tunnel syndrome was a contributing factor to his depression.
If there are disputed factual issues, the findings of the trial court are conclusive where there is substantial evidence to support those conclusions. G.UB.MK. Constructors v. Traffanstedt, 726 So.2d 704, 708 (Ala.Civ.App.1998). A trial court's factual finding based upon conflicting ore tenus evidence will not be disturbed on appeal unless that finding is clearly erroneous or manifestly unjust. Blackman v. Gray Rider Truck Lines, Inc., 716 So.2d 698, 700 (Ala.Civ.App.1998). It is the duty of the trial court, which had the opportunity to observe the witnesses and their demeanor, and not the appellate court, to weigh the evidence presented. Id. at 700. The role of the appellate court is not to reweigh the evidence, but to affirm the judgment of the trial court if its findings are reasonably supported by the evidence and the correct legal conclusions are drawn therefrom. Ex parte Trinity Indus., 680 So.2d at 268-69; Fryfogle v. Springhill Mem'l Hosp., Inc., 742 So.2d 1255 (Ala.Civ.App.1998), aff'd, 742 So.2d 1258 (Ala.1999). As this court stated in Fryfogle, with respect to a trial court's finding as to the extent of disability under the Alabama Workers' Compensation Act:
"It is the duty of the trial court to make some determination as to the extent of disability. In making the determination, the trial court must consider all the evidence, including its own observations, and interpret it to its own best judgment. This court is precluded from weighing the evidence presented before the trial court."
742 So.2d at 1258 (citations omitted). Based on the foregoing facts and authorities, we cannot hold that the trial court's finding that Melton had sustained a 40% disability was not supported by substantial evidence or that it was clearly erroneous or manifestly unjust.

*1173 Unauthorized Medical Expenses

Finally, International Paper contends that the trial court erred in ordering International Paper to pay for past medical treatment by unauthorized physicians for Melton's carpal tunnel syndrome. Regarding this issue, the trial court found:
"Another claim by [Melton] is for the reimbursement of out of pocket expenses for this injuries' treatment. Based upon the evidence in this case, specifically, the denial of [Melton's] claim for carpal tunnel syndrome treatment and the denial of approval of diagnostic testing for such condition by [International Paper's] [workers'] compensation administrator, the Court hereby orders [International Paper] to reimburse [Melton] for his out of pocket medical expenses associated with carpal tunnel treatment only.
"....
"The final issue before this Court is for the Court to determine any medical expenses to which [Melton] may be owed which have not been paid by [International Paper]. Such issue is governed by the case of City of Auburn v. Brown, 638 So.2d 1339 (Ala.Civ.App.1993). Such case cites instances where a claimant may incur work-accident expenses without first obtaining approval of such from the employer. Such instances are (1) where the employer has neglected or refused to provide the necessary medical care; (2) where the employer has consented to the selection by the employee; (3) where notice of and request for alternative care would be futile; and (4) where other circumstances exist which justify the selection of alternative care by the employee. City of Auburn v. Brown, 638 So.2d 1339 (Ala.Civ.App. 1993). In this case, the Court has found that [International Paper's] third party administrator for its [workers'] compensation program had denied [Melton's] carpal tunnel syndrome claim and had denied approval of diagnostic tests for such. Therefore, this Court finds that [International Paper] shall be responsible for paying for all past treatment expenses incurred by [Melton] for his carpal tunnel syndrome complaints including reimbursement of his out of pocket expenses. However, [International Paper] is not responsible for reimbursing [Melton] for out of pocket expenses associated with any unauthorized treatment for his neck or back condition."
The Workers' Compensation Act provides that an employer is not liable for medical or surgical treatment provided by a physician who has not been authorized by the employer to provide such treatment, see § 25-5-77, Ala.Code 1975; however, the four exceptions to this general rule (noted by the trial court, citing City of Auburn v. Brown, 638 So.2d 1339 (Ala.Civ. App.1993)) were first recognized in United States v. Bear Brothers, Inc., 355 So.2d 1133, 1138 n. 2 (Ala.Civ.App.1978). We agree with Melton that his medical treatment for his carpal tunnel syndrome fell within exceptions (1), (3), and/or (4) recognized in City of Auburn. In the present case, International Paper did not consider Melton's carpal tunnel syndrome to be work related, and, therefore, never authorized any medical treatment for Melton's carpal tunnel syndrome, not even diagnostic procedures. Based on the facts of this case and the authorities cited, we cannot conclude that the trial court erred in ordering International Paper to pay for past medical treatment by unauthorized physicians for Melton's carpal tunnel syndrome.
Based on the foregoing facts and the reasons stated herein, the judgment of the trial court is due to be affirmed.
AFFIRMED.
*1174 YATES, P.J., concurs.
CRAWLEY, J., concurs specially.
THOMPSON, J., concurs in the result.
PITTMAN, J., dissents.
CRAWLEY, Judge, concurring specially.
I concur with the majority opinion. However, I write specially to address an issue that concerns this court's opinion in Oden v. Gulf States Steel, Inc., 797 So.2d 1093 (Ala.Civ.App.2001)a case that I authoredand the subsequent reliance on that case made in United Defense, L.P. v. Willingham, 829 So.2d 771 (Ala.Civ.App. 2002)a case now relied upon by International Paper and by Judge Pittman in his dissent.
In Oden, the worker contended that he had suffered an injury through repeated trauma to the cervical spine in the line and course of his employment as a crane operator. Expert medical testimony was presented that supported the worker's claim to the extent that his work "likely" or "might have" contributed to his injury. The company presented evidence that the worker was malingering and that he had congenital spine problems that were not work related. In consideration of that evidence, this court reached the conclusion that the trial court's denial of workers' compensation benefits was due to be affirmed. Judge Murdock also correctly added in his special concurrence in Oden that the ore tenus standard of review had application to that case.
In the concluding paragraph of Oden, this court stated that "[w]e conclude that the worker's evidenceevidence indicating that he might have had, or possibly had, a work-related conditionwhen compared with the company's evidenceevidence indicating that the worker's problems were not work-related or were exaggerated cannot be considered `clear and convincing evidence' indicating that his injury arose out of and in the course of his employment." 797 So.2d at 1094. I now am cognizant of the fact that that statement could be construed in an overly broad manner.
In Willingham, this court reversed a trial court's award of benefits to a worker for carpal tunnel syndrome, relying on Oden and stating that "[t]his court has held that evidence indicating that an employee `might have had' or `possibly had' a work-related injury does not meet the clear-and-convincing evidence standard when there is conflicting testimony indicating that the employee's injury was not work-related." 829 So.2d at 773.
I write to clarify my belief that the consideration of whether a worker has presented clear and convincing evidence to support a claim for an injury based on gradual deterioration or cumulative physical stress, alleged to have arisen in the line and course of his or her employment, includes the consideration of not only the medical testimony presented, but also the worker's lay testimony. See Hooker Constr., Inc. v. Walker, 825 So.2d 838, 843 (Ala.Civ.App.2001)(citing Wal-Mart Stores, Inc. v. Kennedy, 799 So.2d 188, 195 (Ala.Civ.App.2001))(stating that the trial court can consider lay, as well as expert, testimony on the issue of medical causation); Waffle House, Inc. v. Howard, 794 So.2d 1123, 1128-29 (Ala.Civ. App.2000)(same). Further, under the ore tenus standard of review, a trial court's judgment carries a presumption of correctness and, in consideration of this issue, a presumption of correctness should be accorded to the oral testimony presented by either the worker or the employer that supports the trial court's judgment. See McGhee v. International Paper Co., 729 So.2d 880, 881 (Ala.Civ. *1175 App.1999)("The evidence presented to the trial court consisted of stipulations, depositions, and exhibits. The trial court heard no oral testimony; therefore, the ore tenus principle does not apply.")(citing Whitehead v. Hester, 512 So.2d 1297, 1299 (Ala.1987)).
Accordingly, I would not read Oden or Willingham for the proposition that, in every case in which a worker fails to present medical evidence that his or her employment was, to a medical certainty, a contributing cause of his or her injury and in which the employer has presented evidence that it was not, the worker has failed to produce clear and convincing evidence in support of his or her claim.
PITTMAN, Judge, dissenting.
I respectfully dissent. The standard of proof in workers' compensation cases "involving injuries which have resulted from gradual deterioration or cumulative physical stress disorders," such as carpal tunnel syndrome, is that such injuries "shall be deemed compensable only upon a finding of clear and convincing proof that those injuries arose out of and in the course of the employee's employment." Ala.Code 1975, § 25-5-81(c) (emphasis added). Viewed in a light most favorable to Melton, the expert medical evidence supports only the proposition that his work as a forklift operator could have caused or could have aggravated his carpal tunnel syndrome or that that work probably was a contributing factor. In my view, such speculative evidence does not satisfy § 25-5-81(c). See United Defense, L.P. v. Willingham, 829 So.2d 771 (Ala.Civ.App.2002).
NOTES
[1] Section 25-5-78 provides:

"For purposes of this article only, an injured employee or the employee's representative, within five days after the occurrence of an accident, shall give or cause to be given to the employer written notice of the accident. If the notice is not given, the employee or the employee's dependent shall not be entitled to physician's or medical fees nor any compensation which may have accrued under the terms of this article, unless it can be shown that the party required to give the notice had been prevented from doing so by reason of physical or mental incapacity, other than minority, fraud or deceit, or equal good reason. Notwithstanding any other provision of this section, no compensation shall be payable unless written notice is given within 90 days after the occurrence of the accident or, if death results, within 90 days after the death."
[2] We also note that International Paper's argument is essentially the same argument the employer made in Dun & Bradstreet, supra. In Dun & Bradstreet, the employer argued that the rule adopted in American Cyanamid v. Shepherd, 668 So.2d 26 (Ala.Civ.App.1995), for determining when the statute of limitations begins to run in cases involving "latent injuries" should control the outcome in that case, a case involving what the court termed a "cumulative effect injury," namely carpal tunnel syndrome. See Dun & Bradstreet, 678 So.2d at 184. In American Cyanamid, this court held that, for latent injuries, "`[t]he time period [of the statute of limitations] does not begin to run until the claimant, as a reasonable person, should recognize the nature, seriousness, and compensable character of his injury or disease.'" 668 So.2d at 28 (quoting 2B A. Larson, The Law of Workmen's Compensation § 78.41(a) (1989)). While acknowledging the validity of the rule employed in American Cyanamid with respect to cases involving latent injuries, this court determined that that rule was not controlling in Dun & Bradstreet because the carpal tunnel injury was a cumulative effect injury like that in Gattis, supra.
[3] Section 25-5-81(c) provides, in pertinent part:

"The decision of the court shall be based on a preponderance of the evidence as contained in the record of the hearing, except in cases involving injuries which have resulted from gradual deterioration or cumulative physical stress disorders, which shall be deemed compensable only upon a finding of clear and convincing proof that those injuries arose out of and in the course of the employee's employment."
[4] That letter asked the question, "Doctor based on your examination and treatment of [Melton], do you have an opinion as to whether or not work was a contributing factor to his medical problems?" In a handwritten response on the face of the letter, Dr. Lett responded, "Work as a forklift driver could cause and is a contributing factor to carpal tunnel syndrome."