953 So.2d 1196 (2006)
Werner BEIERSDOERFER
v.
HILB, ROGAL and HAMILTON COMPANY et al.
Hilb, Rogal and Hamilton Company et al.
v.
Werner Beiersdoerfer.
1012243 and 1012304.
Supreme Court of Alabama.
September 22, 2006.
*1198 William K. Thomas of Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham; and James R. Morgan, Birmingham, for appellant/cross-appellee Werner Beiersdoerfer.
Michael D. Freeman, Allen M. Estes, Vincent J. Bodin, and J. Eric Getty of Balch & Bingham, LLP, Birmingham, for appellees/cross-appellants Hilb, Rogal and Hamilton Company et al.

*1199 On Applications for Rehearing

PER CURIAM.
This Court's opinion of January 7, 2005, is withdrawn, and the following is substituted therefor.
The defendant/counter-plaintiff Werner Beiersdoerfer appeals the grant of the motion for new trial filed by the "HRH" plaintiffs/counter-defendants Hilb, Rogal and Hamilton Company ("HRH"); Hilb, Rogal and Hamilton of Alabama, Inc. ("HRH Alabama"); and Beiersdoerfer-Meadows, Inc. (collectively "the HRH plaintiffs"). The HRH plaintiffs cross-appeal the denial of their motions for a summary judgment and a judgment as a matter of law ("JML"). In case no. 1012304, we decline to review the denial of the motion for a summary judgment, and we dismiss the appeal in part and affirm the denial of the motion for a JML. In case no. 1012243, we reverse the order granting the motion for a new trial, and we remand the case for further proceedings consistent with this opinion.

Substantive Facts
In reviewing rulings on motions for a summary judgment or a JML, we consider all of the relevant undisputed evidence, accept the tendencies of the disputed evidence most favorable to the nonmoving party, and resolve all reasonable factual doubts in favor of the nonmoving party. Alexander, Corder, Plunk, Baker & Shelly, P.C. v. Jackson, 811 So.2d 506, 513 (Ala. 2001), and Alfa Life Ins. Corp. v. Jackson, 906 So.2d 143, 146 (Ala.2005). Considered in that manner, the evidence established the following facts.
On January 1, 1998, Beiersdoerfer, the sole shareholder of Beiersdoerfer-Meadows, Inc. ("BMI"), an insurance agency, sold all of the stock in BMI to HRH for $700,000 and executed a written stock-purchase agreement. In addition, Beiersdoerfer agreed to work for HRH for two years and executed a written employment agreement. In both the stock-purchase agreement and the employment agreement, Beiersdoerfer agreed that he would not compete with HRH for a specified period of time. As an employee of HRH, Beiersdoerfer continued to manage the accounts of BMI and to supervise subordinates.
In June 2000, Beiersdoerfer told Richard Simmons III, regional director of HRH, that Beiersdoerfer wanted to terminate his employment with HRH. Beiersdoerfer offered to repurchase BMI from HRH. Simmons told Beiersdoerfer that Simmons would have to discuss Beiersdoerfer's offer to purchase BMI with Mel Vaughn, the chief operating officer of HRH, because Simmons did not have authority to accept or to reject such an offer on behalf of HRH. Vaughn rejected Beiersdoerfer's offer.
After Vaughn rejected Beiersdoerfer's offer to repurchase BMI, Beiersdoerfer and Simmons began discussing the possibility of Beiersdoerfer's continuing to manage the accounts of BMI for HRH as an independent broker instead of as an employee. Beiersdoerfer asked Simmons whether he had the authority to agree to such an arrangement without seeking approval from the home office of HRH in Richmond, Virginia. Simmons responded "that he had the authority and the decision could be made locally and no Richmond." (At trial, however, Vaughn testified that Simmons did not have such authority.)
Thereafter, Beiersdoerfer and Simmons met in mid-November 2000 ("the mid-November meeting"). Simmons asked Beiersdoerfer *1200 to go over his proposal to manage the accounts of BMI as an independent broker. Beiersdoerfer stated that he proposed to resign as an employee of HRH, to manage the accounts of BMI as an independent broker, and to split the commissions generated by those accounts with HRH. Simmons suggested that HRH should receive 60% of the commissions and Beiersdoerfer should receive 40%. Beiersdoerfer agreed and stated that he would pay all of his expenses out of his share of the commissions. Beiersdoerfer further stated that the arrangement would continue until HRH received an amount equal to the $700,000 it had paid Beiersdoerfer for the stock in BMI less any profits already received by HRH from the operation of BMI ("the monetary goal"). Finally, Beiersdoerfer stated that, under his proposal, any new business referred by HRH to BMI would remain with HRH when the arrangement ended and any new business generated by Beiersdoerfer or referred by outside brokers would go with him when the arrangement ended. At the end of this discussion, Simmons said: "I understand and I agree." Simmons then told Beiersdoerfer that he was leaving at the end of the year to take another position, and he asked Beiersdoerfer to explain the arrangement to David Hobbs, the president of HRH Alabama. After the mid-November meeting, Beiersdoerfer made informal arrangements to sublease office space in another building where he planned to manage the BMI accounts as an independent broker; he arranged for a moving company; and he moved his office.
On November 21, 2000, Beiersdoerfer, Simmons, and Hobbs met to discuss Beiersdoerfer's managing the BMI accounts for HRH as an independent broker ("the November 21 meeting"). Beiersdoerfer recited the terms he and Simmons had discussed at the mid-November meeting. Hobbs complained that two BMI agents, Kevin Tangney and Heidi Parker, who is Beiersdoerfer's daughter, were planning to leave BMI without having signed covenants not to compete with HRH. Hobbs said that he could cause trouble for Parker and Tangney even though they had not signed a covenant not to compete. Beiersdoerfer said he would continue to manage the BMI accounts until HRH received $75,000 more than the monetary goal if Hobbs would refrain from causing trouble for Parker and Tangney. Hobbs stated: "I agree." Hobbs then told Beiersdoerfer that, because they were going to implement the independent-broker arrangement, Beiersdoerfer should take BMI's files to his office. Although Hobbs said that he wanted Simmons to reduce the terms of the agreement between Beiersdoerfer and HRH to writing, neither he nor Simmons indicated that the assent of HRH to the agreement was contingent on its being reduced to writing. Beiersdoerfer testified at trial that no details of the agreement remained unresolved at the end of the November 21 meeting. Simmons admitted at trial that neither he nor Hobbs told Beiersdoerfer at the November 21 meeting that any details of their agreement remained unresolved.
The next day, Beiersdoerfer moved BMI's files from the offices of HRH to his new office. While he was at HRH's offices, he saw Simmons, who stated, "I was glad that we were able to reach an agreement." On December 1, Beiersdoerfer executed a sublease on his new office.
After the mid-November meeting and the November 21 meeting, Simmons instructed the comptroller of HRH to pay Beiersdoerfer 40% of the revenue of BMI *1201 as a commission after December 31. The comptroller then prepared a budget for the next year showing Beiersdoerfer as receiving 40% of the revenue of BMI as a commission.
On November 27 and 28, 2000, Simmons and Hobbs met with Vaughn at the home office of HRH in Richmond ("the November 27 and 28 meetings"). Vaughn said that "there should be a one-year consulting agreement [with Beiersdoerfer] with a non-piracy agreement upon termination and that it should have a 30-day termination clause and that it was  should only be needed for 90- to 120 days." Vaughn's plan was that Wayne Bowling, an HRH employee, would become familiar with the BMI accounts during this 90- to 120-day period and the consulting agreement would then be terminated. No one told Beiersdoerfer about Vaughn's instructions at the November 27 and 28 meetings.
When Beiersdoerfer returned to his office after the New Year's Day holiday, he found an unsigned faxed letter from Hobbs dated December 29. The letter stated:
"The purpose of this letter is to outline the terms of our agreement:
"1. Werner Beiersdoerfer will retire from HRH effective January 1, 2000[sic]. At that time he will become an independent broker, serving the accounts assigned to him. See attached list. We agree that the long-term objective is to orderly transfer these accounts to an HRH producer.
"2. All Fees & Commissions will be paid to HRH. HRH will then pay Mr. Beiersdoerfer 40% of the commissions and fees generated by these assigned accounts.
"3. The files on these accounts will remain with Mr. Beiersdoerfer, but will be returned at any time to HRH at their request.
"4. HRH will not extend errors and omissions coverage to Mr. Beiersdoerfer.
"5. Mr. Beiersdoerfer agrees that at no time in the future will he work in collusion with his daughter, Heidi Parker, to solicit these assigned accounts.
"6. If at any time in the future, either Werner Beiersdoerfer or HRH becomes dissatisfied with this arrangement, either party can cancel this agreement with 30 days notice. At that time, Mr. Beiersdoerfer agrees to never contact or solicit these assigned accounts."
On January 2, Beiersdoerfer telephoned Simmons and left a message on his answering machine. The message stated that Hobbs's December 29 letter was satisfactory except for the statement in paragraph 4 that HRH would not provide Beiersdoerfer with errors-and-omissions coverage and the statement in paragraph 6 that Beiersdoerfer would "never contact" clients of BMI. Simmons acknowledged that he received the message and that he conveyed the information to Hobbs. That same day, Hobbs signed a payroll authorization form listing Beiersdoerfer's date of termination as an employee of HRH as December 31, 2000.
On January 3, Hobbs showed Vaughn a copy of Hobbs's December 29 letter. Vaughn became angry and asked Hobbs if he understood that the letter amended the employment and stock-purchase agreements. Vaughn instructed Hobbs to "get out" of the agreement with Beiersdoerfer. Hobbs and Fred Renneker, the chief executive officer of HRH Alabama, went to Beiersdoerfer's office on January 8. Hobbs *1202 gave Beiersdoerfer a letter signed by Hobbs and dated January 5. In pertinent part, the letter stated:
"I have made the decision to terminate your employment as of February 9, 2001. Since we have not finalized our arrangement (earlier faxed to you), that proposed offer is retracted as well."
After giving Beiersdoerfer this letter, Hobbs said, "Mel [Vaughn] didn't like the agreement." Beiersdoerfer responded that they had an agreement. Renneker then said that the agreement had not been reduced to writing and signed. Beiersdoerfer responded that oral agreements were binding in Alabama, that he intended to abide by the oral agreement they had reached, and that he expected HRH to abide by it as well.
A few days after this meeting, Beiersdoerfer's wife received a letter from HRH informing her of her right, under COBRA, to continue her health insurance coverage under the group plan for up to 18 months after the termination of Beiersdoerfer's employment on December 31, 2000. Later in January, HRH generated a payroll authorization form to reinstate Beiersdoerfer's pay and benefits as an employee through February 9, 2001.

Procedural Facts
Alleging that Beiersdoerfer had violated the covenants not to compete in the stock-purchase and employment agreements, the HRH plaintiffs sued him, alleging breach of contract, breach of fiduciary duty, and tortious interference with business relationships.[1] Beiersdoerfer counterclaimed, alleging breach of contract, misrepresentation, suppression, defamation, defamation per se, conspiracy, and invasion of privacy.
As the factual basis of his breach-of-contract claim, Beiersdoerfer alleged that Beiersdoerfer and HRH had formed an oral contract at the mid-November and November 21 meetings and that HRH had breached that oral contract. As part of the factual basis of his misrepresentation claim, Beiersdoerfer alleged that, after September 2000 and before the mid-November meeting, Simmons had misrepresented to Beiersdoerfer "[t]hat Simmons possessed the authority to enter a contract on behalf of [HRH] regarding Beiersdoerfer's management of accounts" and "[t]hat the agreement regarding Beiersdoerfer's management of accounts could be made `locally,' and did not require the `approval of Richmond.'" In addition, Beiersdoerfer alleged that Simmons and Hobbs, at the November 21 meeting, had misrepresented the intent of HRH "to be bound by the terms and conditions agreed upon," "to perform the terms and conditions for a time period sufficient to achieve the monetary goal agreed upon," and "to reduce the terms and conditions to writing." As the factual basis of his suppression claim, Beiersdoerfer alleged that, between November 2000 and January 8, 2001, Simmons and Hobbs had suppressed the fact "[t]hat Simmons did not possess the authority to enter a contract on behalf of [HRH] regarding Beiersdoerfer's management of accounts"; the fact "[t]hat the agreement regarding Beiersdoerfer's management of accounts could not be handled `locally'"; the fact that such an agreement "did require the `approval of Richmond'"; the fact "that [HRH] did not intend to honor the terms and conditions agreed upon"; the fact "that [HRH] formed an intent to repudiate the agreement reached within 90 *1203 to 180 days"; the fact "that Mel Vaughn had instructed them that the most he could live with was a one-year consulting agreement terminable on 30-day's notice with a non-piracy clause, and that he expected that it would only be needed for 90 to 180 days"; and the fact "that [HRH] had no intention of allowing the parties to perform as agreed upon."
The HRH plaintiffs moved for a summary judgment on Beiersdoerfer's counterclaims. However, the trial court denied the summary-judgment motion, and the case proceeded to trial. The HRH plaintiffs, on the one hand, and Beiersdoerfer, on the other, moved for a JML at the close of all the evidence. As grounds for a JML on Beiersdoerfer's breach-of-contract claim, the HRH plaintiffs asserted that Beiersdoerfer had not introduced substantial evidence tending to prove that the parties had mutually assented to all of the terms of the putative oral contract and substantial evidence tending to prove that the putative oral contract specified how it had modified the stock-purchase and employment agreements. As grounds for a JML on Beiersdoerfer's misrepresentation claim, the HRH plaintiffs asserted that Beiersdoerfer had not introduced substantial evidence indicating that Simmons's representation was false, that Beiersdoerfer had relied upon Simmons's representation, and that Beiersdoerfer was damaged by relying upon Simmons's representation. As the ground for a JML on Beiersdoerfer's suppression claim, the HRH plaintiffs asserted that Beiersdoerfer had not introduced substantial evidence indicating that the HRH plaintiffs had suppressed any facts.
The trial court entered a JML in favor of the HRH plaintiffs on all of Beiersdoerfer's claims except his breach-of-contract, misrepresentation, and suppression claims. The trial court entered a JML in favor of Beiersdoerfer on all of the claims of the HRH plaintiffs except their breach-of-contract claim. The trial court then charged the jury on the HRH plaintiffs' breach-of-contract claim and Beiersdoerfer's breach-of-contract, misrepresentation, and suppression claims. The trial court did not instruct the jury that it could not return a verdict for Beiersdoerfer on both his breach-of-contract claim and his misrepresentation claim. The verdict form the trial court gave the jury to be used if the jury found in favor of Beiersdoerfer allowed the jury to return a verdict for Beiersdoerfer both "[f]or breach of contract" and "[f]or fraud" without requiring the jury to specify whether a verdict for Beiersdoerfer "[f]or fraud" was a verdict on the misrepresentation claim only, a verdict on the suppression claim only, or a verdict on both of those claims.
Immediately after the trial court charged the jury and before the jury retired to consider its verdict, counsel for the HRH plaintiffs, outside the presence of the jury, stated on the record:
"It seems to me that Mr. Beiersdoerfer should  and I admit I have not researched  but he should elect between his remedies, fraud and breach of contract, since they're based upon the same facts. And there's the potential for the jury, if they rule his way on both of those claims, to award double damages. But I admit to you I have not researched that as of yet."
The trial court did not give the jury any additional instructions in response to this statement. Thereafter, the jury returned a verdict in favor of Beiersdoerfer on the HRH plaintiffs' breach-of-contract claim and in favor of Beiersdoerfer on his claims *1204 against the HRH plaintiffs. Using the verdict form provided by the trial court, the jury awarded Beiersdoerfer $250,000 "[f]or breach of contract" and $1,000,000 "[f]or fraud." The trial court entered judgment on the jury verdict.
The HRH plaintiffs renewed their motion for a JML and moved, in the alternative, for a new trial or a remittitur. As one of the grounds of their motion for a new trial, the HRH plaintiffs asserted that the jury verdict was inconsistent because it awarded Beiersdoerfer damages for both breach of contract and fraud, claims that presupposed inconsistent facts. Although the trial court denied the HRH plaintiffs' motion for a JML, it awarded them a new trial on the ground that the verdict returned by the jury was inconsistent. The trial court reasoned:
"Beiersdoerfer contended before the jury that a valid contract existed which was breached by HRH and he was entitled to damages as a result of this breach. At the same time Beiersdoerfer contended before the jury that the contract was invalid because Simmons fraudulently represented to [Beiersdoerfer] that [Simmons] had the authority to enter into the contract without the approval of the home office in Richmond, Virginia, when in fact he did not have such authority and he was entitled to damages for the fraudulent misrepresentation. These theories of recovery are factually inconsistent and a general verdict allowing recovery under both theories is self-contradictory. It is well settled under Alabama law that a plaintiff may present alternative, inconsistent, and mutually exclusive claims to the jury. King v. Cooper Green Hospital, 591 So.2d 464 (Ala.1991). However, a plaintiff may recover under only one of those claims. United States Fidelity & Guaranty Company v. McKinnon, 356 So.2d 600 (Ala.1978). No instruction was given to the jury in that regard, and the jury in fact awarded damages for both breach of contract and fraud."
The trial court acknowledged that a portion of Beiersdoerfer's suppression claim did not presuppose the invalidity of the putative oral contract. However, the trial court reasoned:
"The verdict on the fraud claims was in the form of a general verdict and did not distinguish between the fraudulent misrepresentation and the fraudulent suppression claims. The Court therefore cannot determine from the verdict whether the jury award [for fraud] was based upon the fraud claim of misrepresentation, which would be inconsistent with the breach of contract award and would be improper, or was based upon the fraud claim of suppression, which would perhaps be permissible. Therefore, the verdict rendered herein is inconsistent, and the judgment entered pursuant to said verdict must be set aside."

Issues
Beiersdoerfer presents the issue as whether the trial court erred in granting a new trial for the HRH plaintiffs. In cross-appealing, the HRH plaintiffs raise these issues: (1) whether the trial court erred in denying their motion for a summary judgment, and (2) whether the trial court erred in denying their motion for a JML. Because a holding that the trial court erred in denying either the motion for a summary judgment or for a JML would moot the issue whether the trial court erred in granting a new trial, we will first address the issues raised by the HRH plaintiffs.

*1205 Law and Analysis

A. The Summary-Judgment Motion

"[W]e do not review a trial court's denial of a summary-judgment motion following a trial on the merits. See Grayson v. Hanson, 843 So.2d 146 (Ala. 2002); Superskate, Inc. v. Nolen, 641 So.2d 231, 233 (Ala.1994); see also Lind v. United Parcel Service, Inc., 254 F.3d 1281, 1283-84 (11th Cir.2001)."
Mitchell v. Folmar & Assocs., LLP, 854 So.2d 1115, 1116 (Ala.2003). Because this case was tried on the merits after the trial court denied the HRH plaintiffs' summary-judgment motion, we will not review the denial of that motion. Mitchell.
B. The Motion for a JML

"When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). . . . A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353."
Delchamps, Inc. v. Bryant, 738 So.2d 824, 830 (Ala.1999). Substantial evidence is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).
Section 6-5-102, Ala.Code 1975, provides:
"Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."
This Court has stated:
"A duty to disclose may arise from the particular circumstances of the case. See Ala.Code 1975, § 6-5-102. Those circumstances include `(1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiff's opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances.' State Farm Fire & Cas. Co. v. Owen, 729 So.2d 834, 842-43 (Ala.1998)."
Bethel v. Thorn, 757 So.2d 1154, 1162 (Ala. 1999).
Regarding the breach-of-contract claim, the HRH plaintiffs first argue that they were entitled to a JML because, they argue, Beiersdoerfer did not introduce substantial evidence tending to prove the essential element of mutual assent. We disagree. Beiersdoerfer introduced evidence that Simmons stated, "I understand and I agree" at the conclusion of the mid-November meeting; that Hobbs stated, "I agree" at the conclusion of the November 21 meeting; and that HRH acted in conformity with the putative oral contract until Vaughn instructed Hobbs to "get out" of the agreement with Beiersdoerfer. This evidence constituted substantial evidence tending to prove mutual assent to the putative oral contract.
*1206 Second, citing Smiths Water Authority v. City of Phenix City, 436 So.2d 827 (Ala. 1983), the HRH plaintiffs argue that they were entitled to a JML on Beiersdoerfer's breach-of-contract claim because, they argue, Beiersdoerfer did not introduce substantial evidence indicating that the putative oral contract was definite in providing how it modified the written stock-purchase and employment agreements. In Smiths Water Authority, this Court held that "mere negotiations for a contract modification do not amount to a modification," because mere negotiations do not prove mutual assent to the modification. 436 So.2d at 831. Smiths Water Authority is distinguishable from this case because Beiersdoerfer introduced substantial evidence of mutual assent to the oral contract.
Moreover, the oral contract was definite in providing how it modified the stock-purchase and employment agreements. First, the oral contract authorized Beiersdoerfer to manage the accounts of BMI as an independent broker after the termination of his employment with HRH. Second, the oral contract provided that Beiersdoerfer would receive 40% of the revenue of BMI after the termination of his employment with HRH. Third, the oral contract authorized Beiersdoerfer to solicit new clients for BMI and to accept referrals of clients from other brokers after the termination of his employment with HRH. Fourth, the oral contract provided that clients generated by Beiersdoerfer or referred by brokers other than HRH would remain with Beiersdoerfer upon termination of the oral contract. All of these provisions of the oral contract were definite modifications of the stock-purchase and employment agreements.
Any terms of those agreements not effectively modified remained in effect. Hauben v. Harmon, 605 F.2d 920, 925 n. 2 (5th Cir.1979) ("Although a contract may be modified, the general rule is that the original contract stays in force except as modified. 17 AmJur.2d Contracts § 459."). The HRH plaintiffs cite no authority for the proposition that the oral contract could not exist without modification of still more terms of the stock-purchase and employment agreements.
Although the HRH plaintiffs, in arguing to us that they were entitled to a summary judgment, briefed to us what they regarded as deficiencies in Beiersdoerfer's proof of several other terms the HRH plaintiffs argued to be essential to an oral contract, the HRH plaintiffs do not brief any of these other purported deficiencies in support of their argument that they were due a JML. "Issues not argued in a party's brief are waived." Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1167 (Ala.2003).
Regarding misrepresentation, the HRH plaintiffs first argue that Beiersdoerfer did not introduce substantial evidence indicating that Simmons lacked authority to agree to the putative oral contract on behalf of HRH. However, this argument has no merit because Beiersdoerfer introduced the testimony of Mel Vaughn to the effect that Simmons did not have such authority. Second, the HRH plaintiffs argue that Beiersdoerfer did not introduce substantial evidence indicating that Simmons and Hobbs misrepresented the intent of HRH to be bound by the putative oral contract. However, that argument has no merit. Beiersdoerfer introduced evidence indicating that Simmons responded to the contract terms proposed by Beiersdoerfer at the mid-November meeting *1207 by stating "I understand and I agree" and that Hobbs responded to the contract terms proposed by Beiersdoerfer at the November 21 meeting by stating "I agree." That evidence constituted substantial evidence indicating that Simmons and Hobbs misrepresented the intent of HRH to be bound by the putative oral contract.
The HRH plaintiffs also argue that Beiersdoerfer did not introduce substantial evidence that HRH did not intend to perform the promises made by Simmons and Hobbs and that it intended to deceive Beiersdoerfer when the promises were made, two essential elements of a claim of promissory fraud. See Clanton v. Bains Oil Co., 417 So.2d 149, 151 (Ala.1982) ("In order for promises or opinions to constitute fraudulent misrepresentations, there must have been at the time the representations were made an intention not to do the act promised, and such promise or opinion must have been given with intent to deceive."). However, because neither the verdict in favor of Beiersdoerfer nor the judgment entered on that verdict were based on Beiersdoerfer's promissory-fraud claim, this argument is moot.
When the trial court charged the jury, it did not charge the jury regarding Beiersdoerfer's promissory-fraud claim. Moreover, Beiersdoerfer did not object to the trial court's failure to so charge the jury. By not objecting to the trial court's failure to charge the jury regarding his promissory-fraud claim, Beiersdoerfer waived his promissory-fraud claim; therefore, the verdict returned by the jury could not have been based upon that claim. Regions Bank v. Plott, 897 So.2d 239, 247 (Ala.2004) ("When the [plaintiffs] expressed their approval of the jury charge, which did not include instructions on their claim of intrusion on seclusion, they waived that claim, and the general verdict returned by the jury could not have been based on it."). Because the verdict returned by the jury could not have been based on Beiersdoerfer's promissory-fraud claim, the judgment entered on that verdict could not have been based on Beiersdoerfer's promissory-fraud claim. Plott, 897 So.2d at 247. Because neither the verdict returned by the jury nor the judgment entered on that verdict could have been based on Beiersdoerfer's promissory-fraud claim, the HRH plaintiffs' challenge to the denial of a JML with respect to Beiersdoerfer's promissory-fraud claim is moot. 897 So.2d at 247 ("Because the claim [of intrusion on seclusion] was not included in the verdict, or in the judgment entered on that verdict, [the defendant's] challenge to the denial of a JML as to that claim is moot."). Therefore, we dismiss the HRH plaintiffs' cross-appeal (case no. 1012304) insofar as it challenges the denial of a JML with respect to Beiersdoerfer's promissory-fraud claim because that challenge is moot.
With respect to Beiersdoerfer's misrepresentation claims, the HRH plaintiffs also argue that Beiersdoerfer did not introduce substantial evidence indicating that he relied upon the representations of Simmons and Hobbs. Reliance is an essential element of both misrepresentation of a material existing fact and of promissory fraud. With respect to Beiersdoerfer's claim of promissory fraud, the HRH plaintiffs' lack-of-reliance argument is also moot  neither the verdict returned by the jury nor the judgment entered on that verdict was based on Beiersdoerfer's promissory-fraud claim. With respect to Beiersdoerfer's claim of misrepresentation of a material existing fact, the HRH plaintiffs' lack-of-reliance *1208 argument has no merit because Beiersdoerfer's testimony that he subleased office space at a new location and that he relocated his office there in reliance on the representations of Simmons and Hobbs constitutes substantial evidence that Beiersdoerfer relied upon those representations.
Regarding Beiersdoerfer's suppression claim, the HRH plaintiffs argue that, as a matter of law, HRH owed no duty to disclose material facts to Beiersdoerfer because Beiersdoerfer was a sophisticated businessman. However, this argument does not address other relevant factors, such as the relative knowledge of the parties, the value of the suppressed facts, and Beiersdoerfer's opportunity to ascertain the suppressed facts. Bethel v. Thorn, 757 So.2d at 1162. In determining whether those factors imposed on HRH a duty to disclose, we must consider all of the relevant undisputed evidence, accept the tendencies of the disputed evidence most favorable to Beiersdoerfer, and resolve all reasonable factual doubts in favor of Beiersdoerfer. Alfa Life Ins. Corp. v. Jackson, supra. Considered in that manner, the evidence tended to prove that HRH formed an intent not to honor its obligations under the oral contract when Vaughn stated, at the November 27 and 28 meetings, that he wanted only a consulting agreement with Beiersdoerfer that would last 90 to 120 days. The evidence further tended to prove that the suppression of this information was used by HRH in an attempt, through Hobbs's December 29 letter, to obtain Beiersdoerfer's assent to the addition of a provision to the oral contract that would have given HRH the right to terminate the oral contract on 30 days' notice. This provision would have allowed HRH to gain the benefit of Beiersdoerfer's services for 90 to 120 days while Wayne Bowling became familiar with the accounts and then to terminate its obligations under the oral contract merely by giving Beiersdoerfer notice of termination. This would have deprived Beiersdoerfer of the benefits he expected to receive when he contracted with HRH to manage the BMI accounts until the monetary goal was achieved and simultaneously would have deprived him of his breach-of-contract remedy. Regardless of Beiersdoerfer's sophistication in the insurance-brokering business, he had no opportunity to ascertain this suppressed information; it was known only to the upper management of HRH, who suppressed it. The suppressed information was obviously valuable. Accordingly, we hold that HRH owed a duty to Beiersdoerfer to disclose its intent not to honor the oral agreement. Therefore, the trial court did not err in denying the HRH plaintiffs' motion for a JML on Beiersdoerfer's suppression claim.

C. The Motion for a New Trial

"Denying, and to a more limited extent granting, a motion for new trial is within the sound discretion of the trial court." Carter v. Henderson, 598 So.2d 1350, 1354 (Ala.1992) (citation omitted). "[T]his Court will reverse an order granting a new trial when some legal right is denied and the record clearly shows that the trial court abused its discretion." Hayden v. Elam, 739 So.2d 1088, 1093 (Ala.1999) (citation omitted).
Beiersdoerfer argues on appeal that the trial court's order setting aside the verdict is "erroneous because [the HRH plaintiffs] did not request an instruction to the jury that Beiersdoerfer could recover on only one of the claims which [the HRH plaintiffs claim] to be inconsistent, *1209 and [the HRH plaintiffs] did not object to the failure of the trial court to instruct the jury to that effect."
In Bird v. Metropolitan Life Insurance Co., 705 So.2d 363, 365 (Ala.1997), this Court, citing Rule 59, Ala. R. Civ. P., stated that preservation of error was a requisite for the granting of a new trial: "A trial judge may grant a new trial on the ground that an error of law occurred at the trial, if the issue was properly preserved. Rule 59, Ala. R. Civ. P., and § 12-13-1[1](a), Ala.Code 1975."
In Scott v. Farnell, 775 So.2d 789, 791 (Ala.2000), this Court explained the background to Rule 59(a):
"Rule 59(a), Ala. R. Civ. P., provides that a new trial may be granted `for any of the reasons for which new trials have heretofore [i.e., before the adoption of the Alabama Rules of Civil Procedure] been granted in actions at law.' The Committee Comments on the 1973 adoption of that rule state:
"`Subdivision (a) expressly provides that the grounds for a new trial under the rule shall be those which would have sufficed for a new trial or a rehearing under prior Alabama practice. Thus the rule makes no change in the grounds for a new trial, and prior Alabama decisions must be consulted to determine when a motion under this rule should be granted. In an action tried to a jury a new trial can be granted for any of the reasons listed in Code of Ala. [1940 (Recomp.1958)], Tit. 7, § 276, or for any of the common-law grounds not listed in that statute.'
"Section 12-13-11, Ala.Code 1975, was derived from Title 7, § 276, Ala.Code of 1940 (Recomp.1958). Thus, a new trial can be granted for the reasons listed in § 12-13-11. One of those reasons is that `[t]he verdict . . . is not sustained by the great preponderance of the evidence.' § 12-13-11(a)(6)."
Applicable here is § 12-13-11(a)(8), Ala. Code 1975, which provides that a new trial may be granted on the ground of "[e]rror of law occurring at the trial and properly preserved by the party making the application."
The discussion offered by the HRH plaintiffs after the charges had been given to the jury did not rise to an objection:
"It seems to me that Mr. Beiersdoerfer should . . . elect between his remedies, fraud and breach of contract, since they're based upon the same facts. And there's the potential for the jury, if they rule his way on both of those claims, to award double damages. But I admit to you I have not researched that as of yet."
See Rule 51, Ala. R. Civ. P. Nor did it address any possible inconsistency. The HRH plaintiffs failed to preserve any error regarding inconsistent claims.
Unobjected-to instructions of the trial court become the law of the case:
"`Unchallenged jury instructions become the law of the case. Louisville & Nashville R.R. v. Atkins, 435 So.2d 1275 (Ala.1983).' Clark v. Black, 630 So.2d 1012, 1017 (Ala.1993). `The jury is bound to follow such instructions, even if they are erroneous. Lee v. Gidley, 252 Ala. 156, 40 So.2d 80 (1949) (erroneous instructions became the law of the case, and a judgment entered on the jury's verdict comporting with those instructions would not be reversed on appeal).' 630 So.2d at 1017.
"Because no party objected in a timely manner, the court's instruction, and the verdict rendered in accordance therewith, became the law of this case. *1210 For these reasons, BIC's inconsistency of the verdict argument will not serve as grounds for reversal of the judgment entered on the jury verdict."
BIC Corp. v. Bean, 669 So.2d 840, 844 (Ala.1995). In Bean, this Court acknowledged the inconsistency, but nonetheless affirmed the judgment because of the failure to object to the jury instructions.
Here, we hold that the trial court exceeded its discretion in ordering a new trial in the absence of a timely objection to the jury charges as given.

Conclusion
We decline to review the denial of the HRH plaintiffs' motion for a summary judgment. Mitchell, supra. We dismiss the HRH plaintiffs' cross-appeal as to the promissory-fraud claim as moot, and we affirm the order denying the HRH plaintiffs' motion for a JML on the other grounds. We reverse the order granting the motion of the HRH plaintiffs for new trial, and we remand this case to the trial court for further proceedings consistent with this opinion.
1012243  OPINION OF JANUARY 7, 2005, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; REVERSED AND REMANDED.
1012304  OPINION OF JANUARY 7, 2005, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; APPEAL DISMISSED AS MOOT IN PART; AFFIRMED IN PART.
SEE, LYONS, HARWOOD, WOODALL, SMITH, BOLIN, and PARKER, JJ., concur.
NABERS, C.J., recuses himself.
NOTES
[1] Although the HRH plaintiffs also named as defendants in the action Parker and Tangney, alleging against them breach of fiduciary duty, the HRH plaintiffs later dismissed the claims against Parker and Tangney.