[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 510 
This court's opinion of November 30, 2007, is withdrawn, and the following is substituted therefor.
Millry Mill Company appeals from a judgment of the trial court awarding Jimmy L. Manuel permanent-total-disability benefits pursuant to the Alabama Workers' Compensation Act, § 25-5-1
et seq., *Page 511 
Ala. Code 1975 ("the Act"). We affirm in part, reverse in part, and remand.
In November 1998, Manuel began working for Millry Mill as a trimmer operator in a lumber mill. As a trimmer operator, Manuel inspected boards and used a saw to trim defects from the boards. Manuel's job required him to lift and turn boards, and it involved repetitive motions of the hands, wrists, and arms. The owner of Millry Mill testified that a trimmer operator like Manuel processes between 5,000 and 6,000 boards per day, with each board measuring 10 board feet.[1] Manuel's supervisor testified that Manuel was required to lift and turn about half of the boards that he processed, i.e., about 2,500 to 3,000 boards daily. Manuel testified at trial that he began experiencing pain in his hands, shoulders, and neck in April 2000.
On November 14, 2001, Manuel sued Millry Mill for workers' compensation benefits, alleging that he had contracted carpal tunnel syndrome as a result of his employment with Millry Mill. Manuel's complaint alleged that he had sustained work-related injuries to his hands, wrists, elbows, and shoulders. The complaint also stated a retaliatory-discharge claim; that claim is not an issue on appeal. Manuel subsequently amended his complaint to allege that he had sustained a work-related neck injury. Millry Mill moved for a partial summary judgment on April 21, 2004, and again on May 13, 2005, asserting, among other things, that Manuel's work with Millry Mill had not caused his injuries; the trial court denied both motions.
The trial court held a trial on April 25, 2006. On November 17, 2006, the trial court entered a judgment awarding permanent and total disability benefits to Manuel. In its judgment, the trial court stated, in pertinent part:
 "Manuel now suffers from both carpal tunnel syndrome and from a neck injury, both of which conditions have totally disabled him, and either of which conditions, standing alone and independently, would have caused him to become totally disabled.
 ". . . [T]he duties performed by Jimmy L. Manuel in the course of his employment, in particular, the repetitive lifting of lumber and the twisting and turning necessary to the performance of his duties, are the cause of both Mr. Manuel's carpal tunnel syndrome condition and his neck injury.
 ". . . [T]here was a direct cause-and-effect relationship between the heavy repetitious work that Mr. Manuel was required to perform at the Millry Mill sawmill and the rupture and tear of the an[n]ulus and the rupture of disc material against the spinal cord, which resulted in Mr. Manuel's neck injury.[2]
 ". . . .
 ". . . [F]ollowing the aforesaid injuries, Mr. Manuel became totally disabled, and continues to be fully disabled, from working at any employment for which he is qualified, or could become qualified."
On appeal, Millry Mill frames the issues as follows:
 "I. Whether the trial court erred in not granting summary judgment on the issue of whether Manuel's injuries were compensable under the Act?
 "II. Whether the trial court erred in admitting opinion testimony of Dr. *Page 512 
Fleet and Dr. Ray over Millry Mill's objection?
 "III. Whether the trial court erred in determining that Manuel's neck injury and carpal tunnel [syndrome claim were] compensable under the Act?
 "IV. Whether the trial court erred in assessing costs against Millry Mill?"
Millry Mill's brief at 6 (capitalization omitted). Additionally, Millry Mill in its principal brief maintains that the trial court erred in not treating Manuel's carpal tunnel syndrome as an injury to a scheduled member and in finding Manuel's carpal tunnel syndrome to be a permanent injury.
Section 25-5-81(e), Ala. Code 1975, provides the standard of review in a workers' compensation case:
 "(1) In reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness.
 "(2) In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence."
Substantial evidence is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. ofFlorida, 547 So.2d 870, 871 (Ala. 1989).
 A.
We first address Millry Mill's issue III: "Whether the trial court erred in determining that Manuel's neck injury and carpal tunnel [syndrome claim were] compensable under the Act?" Millry Mill argues that Manuel failed to present clear and convincing evidence establishing that his neck injury and carpal tunnel syndrome arose out of and in the course of his employment,i.e., that those injuries were "work related." Injuries resulting from gradual deterioration or cumulative physical stress, as in this case, are "compensable only upon a finding of clear and convincing proof that those injuries arose out of and in the course of the employee's employment." § 25-5-81(c), Ala. Code 1975.[3] "Clear and convincing" evidence is
 "`evidence that, when weighted against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.'
"To establish that a cumulative-physical-stress injury is compensable under the Workers' Compensation Act, the employee must establish both legal and medical causation by clear and convincing evidence. Valtex, Inc. v. Brown,897 So.2d 332, 334 (Ala.Civ.App. 2004); Safeco Ins. Co. v.Blackmon, 851 So.2d 532 (Ala.Civ.App. 2002); and § 25-5-81(c), Ala. Code 1975. To establish legal causation, the employee must prove that `the performance of his or her duties as an employee exposed him or her to a danger or risk materially in excess of that to which people are normally exposed in their everyday lives.' Ex parte *Page 513 
 Trinity Indus., Inc., 680 So.2d 262, 267
(Ala. 1996). To establish medical causation, the employee must prove that the danger or risk to which the employee was exposed ` "was in fact [a] contributing cause of the injury"` for which benefits are sought. Id. at 269 (quoting City of Tuscaloosa v. Howard, 55 Ala.App. 701, 318 So.2d 729, 732 (Civ. 1975))."
Madix, Inc. v. Champion, 927 So.2d 833, 837
(Ala.Civ.App. 2005).
The record contained evidence indicating that Manuel, while working for Millry Mill, lifted and turned approximately 2,500 to 3,000 boards daily and used a saw to trim defects from the boards. The trial court had before it sufficient evidence to find that Manuel presented clear and convincing evidence that his employment exposed him to dangers materially in excess of the dangers that we all face in merely living, i.e., that Manuel established legal causation. See id.
Manuel also was required to establish, by clear and convincing evidence, medical causation, i.e., that the risks to which he was exposed while working for Millry Mill were a contributing cause of his injuries. Id. In considering whether Manuel had established medical causation, the trial court had before it the deposition testimony of several doctors who treated or examined Manuel: Dr. Arthur E. Wood, who treated Manuel twice in 2000; Dr. Steven Donald, who treated Manuel once in 2000; Dr. John L. Hinton, a neurologist who treated Manuel several times in 2000-2001 and twice in 2004; Dr. Troy H. Middleton III, who performed a diskectomy on Manuel's neck in July 2000; Dr. William Fleet, a neurologist who treated Manuel three times in 2004 and once in 2005; and Dr. Joseph Ray, an orthopedic surgeon who examined Manuel once in 2004 and once in 2006.
We next address whether Manuel established that his employment with Millry Mill medically caused his carpal tunnel syndrome. Dr. Wood testified that he would "assume" that Manuel's repetitive work activities caused his carpal tunnel syndrome if Manuel did indeed have that condition. Dr. Hinton testified that he did not know if Manuel's work activities with Millry Mill contributed to his carpal tunnel syndrome. Both Dr. Middleton and Dr. Donald testified that Manuel's work activities with Millry Mill could have caused his carpal tunnel syndrome. Dr. Donald also testified that, "in the absence of any other disease process," Manuel's work likely caused his carpal tunnel syndrome.
Dr. Fleet and Dr. Ray each testified that Manuel's work activities at Millry Mill caused or contributed to his carpal tunnel syndrome. Dr. Fleet testified:
 "Q. [By counsel for Manuel]. . . [D]o you have an opinion to a reasonable degree of medical certainty as to whether or not the carpal tunnel syndrome which you have diagnosed was caused or contributed to by [Manuel's] job at Millry Mill?
 ". . . .
 "A. Yes, sir.
 "Q. And what is your opinion?
 "A. It was."
Dr. Ray testified:
 "Q. [By counsel for Manuel]. . . [D]o you have an opinion to a reasonable degree of medical certainty as to whether or not [Manuel's] carpal tunnel syndrome was caused by the work he was performing at [Millry Mill's] sawmill. . . .?
 ". . . .
 "A. Yes.
 ". . . .
 "Q. And what is that opinion? *Page 514 
 "A. I believe that it was related to his work at the mill."
Millry Mill contends that the difference in opinion among the physicians testifying in this case indicates that Manuel has failed to establish clear and convincing evidence of medical causation. However, in International Paper Co. v.Melton, 866 So.2d 1158 (Ala.Civ.App. 2003), this court stated that it was not required
 "to conclude, as a matter of law, . . . in each and every case where the trial court's record includes conflicting medical evidence on the issue of whether an employee's carpal tunnel syndrome is work related, including some medical evidence that the employee's carpal tunnel syndrome was not work related, that the employee has failed to present clear and convincing evidence that the injury was work related. To do so would be to improperly intrude on the trial court's role as fact-finder. Not only might the trial court choose, in an appropriate case, to give greater weight to contrary medical evidence (e.g., the testimony of one or more physicians who opine that the employee's injury did arise out of his work), it also might, in an appropriate case, give weight to the lay testimony presented, including that of the employee himself. . . .
 "We note that `§ 25-5-81(c) does not require proof to an absolute certainty, but rather requires only clear and convincing proof.' Wal-Mart Stores, Inc. v. Kennedy, 799 So.2d 188, 197
(Ala.Civ.App. 2001)."
866 So.2d at 1167-68.
In this case, the testimony of Dr. Wood, Dr. Hinton, Dr. Donald, and Dr. Middleton, taken together, tends to indicate the possibility that Manuel's employment with Millry Mill caused or contributed to his carpal tunnel syndrome. However, Dr. Fleet and Dr. Ray unequivocally testified that Manuel's work activities at Millry Mill caused his carpal tunnel syndrome. Based on the evidence presented in this case, the trial court had before it sufficient evidence to find that Manuel presented clear and convincing evidence that his employment was a contributing cause of his carpal tunnel syndrome, i.e., that Manuel established medical causation. See id.
We next address whether Manuel established that his employment with Millry Mill medically caused his neck injury. In its judgment, the trial court found that Manuel's employment caused "the rupture and tear of the an[n]ulus and the rupture of disc material against the spinal cord." An MRI indicated that Manuel also has spinal stenosis, i.e., the narrowing of the spinal canal, and a spinal lesion.
Dr. Hinton, Dr. Middleton, Dr. Fleet, and Dr. Ray testified regarding the cause of Manuel's neck injury. Dr. Hinton testified:
 "Q. [By counsel for Manuel] Are you aware that [Manuel's] job duties of twisting and turning boards being a cause of . . . the neck injury?
 ". . . .
 "A. I don't know that the type of pathology he had would be particularly from one event. It could be from a series of events or it could be that he had a preexisting lesion that caused him to suddenly get worse.
 ". . . .
 "Q. [By counsel for Millry Mill]. . . Do you have an opinion as to what may have caused this myelopathy[, i.e., an abnormality of the spinal cord]?
 "A. I think he had some spinal stenosis at that level, and I think that repetitive trauma could do it. An acute trauma which would and repetitive trauma, I mean, you know, moving his head back and forth repeatedly, using his head to *Page 515 
hold up a board like a sheetrocker would do. . . .
 ". . . .
 "A. [Responding to a question by counsel for Manuel] Could [Manuel's spinal lesion] have been caused by his work environment? It is more likely that it was caused as a result of his spinal stenosis and . . . that would be something that would occur over a long life-time of work and not a short period of time."
In his deposition testimony, Dr. Hinton did not specifically address Manuel's torn annulus.
 Dr. Middleton testified:
 "Q. [By counsel for Milky Mill] Would this torn annulus and this piece of cartilage cause any of the symptoms that Mr. Manuel was reporting?
 "A. Sure. It's responsible for the narrowing or the stenosis around his cord and it certainly could have caused it.
 "Q. Do you have any opinion as to what may have caused his torn annulus. . . .?
 ". . . .
 "A. No.
 ". . . .
 "Q. [By counsel for Manuel] Would lifting and turning lumber six or eight hours a day for over a year['s] time without any other specific trauma, could that cause the narrowing of the [spinal] canals you discussed earlier?
 ". . . .
 "A. It would be impossible to say. I don't know.
 ". . . .
 "Q. So [Manuel's neck injury] could have arisen from his work-related duties?
 ". . . .
 "A. Sure. It could have arisen from walking across the yard, time. These are — these phenomena we see in patients who — like I said, most patients that have these that we've seen there's not a precipitating traumatic event. They come into me saying they have a pinched nerve or a blown out piece of disc, and in the process of fixing that we observe that the annulus has been torn, but there's no identifiable event per se.
 ". . . .
 "Q. And you would agree this injury could have been work related?
 "A. Sure.
 ". . . .
 "Q. And the work environment could also cause the [spinal] canals to narrow?
 ". . . .
 "A. Yes.
 ". . . .
 "Q. [By counsel for Millry Mill] Do you know, then, whether or not his — you wouldn't have any idea whether his activities on the job would have any effect on his spinal stenosis other than what any normal daily living would have an effect on spinal stenosis?
 "A. Correct.
 "Q. Are you aware of any particular activities that would — if done repetitively, would cause this type of injury?
 "A. Contact sports, football.
 "Q. Any other kind of activity?
 "A. No."
In a second deposition, Dr. Middleton testified:
 "Q. [By counsel for Millry Mill] Do you have any opinion whether or not [Manuel's work activities] could lead to the type of., abnormalities that were found in Mr. Manual's neck?
 ". . . . *Page 516 
 "A. I have no idea."
Dr. Fleet and Dr. Ray each testified that Manuel's work activities at Millry Mill caused or contributed to his neck injury. Dr. Fleet testified:
 "Q. [By counsel for Manuel]. . .[D]o you have an opinion as to whether or not — and this again is to a reasonable degree of medical certainty — the neck injury which [Manuel] suffered was caused by or contributed to by his work at Millry Mill?
 ". . . .
 "A. Yes, sir.
 "Q. And what is your opinion?
 "A. That it was."
Dr. Fleet also opined that repetitive lifting could cause an annulus to gradually tear over time. Dr. Ray testified:
 "A. [By counsel for Manuel] I believe there was a direct cause-and-effect relationship of heavy repetitious work that he did at the sawmill and the rupture, the tear of the an[n]ulus and the rupture of disc material against the spinal cord.
 ". . . .
 "Q. But there's no question in your mind that both the neck injury and the carpal tunnel syndrome were caused by [Manuel's] work?
 "A. In concert all together. It was all part of the process.
 "Q. And it was caused by his work?
 "A. In my opinion, yes, sir."
Dr. Hinton seemed to attribute Manuel's neck problems to his spinal stenosis, which Dr. Hinton opined "would occur over a long lifetime of work." Although Dr. Middleton indicated that Manuel's employment with Millry Mill could have caused or contributed to his neck injury, he testified that he did not know what specifically had caused Manuel's neck injury. However, Dr. Fleet and Dr. Ray unequivocally testified that Manuel's work activities at Millry Mill had caused his neck injury. Given this evidence, the trial court had before it sufficient evidence to find that Manuel presented clear and convincing evidence that his employment was a contributing cause of his neck injury, i.e., that Manuel established medical causation. See Melton, 866 So.2d at 1167-68.
 B.
We next address Millry Mill's issue II: "Whether the trial court erred in admitting opinion testimony of Dr. Fleet and Dr. Ray over Millry Mill's objection?" In separate motions, Millry Mill moved the trial court to strike Dr. Fleet's and Dr. Ray's testimony with respect to "the cause of [Manuel's] neck injury." We read those motions as seeking to strike Dr. Fleet's and Dr. Ray's testimony insofar as it addressed the cause of Manuel's neck injury. Millry Mill did not move the trial court to strike Dr. Fleet's and Dr. Ray's testimony insofar as that testimony addressed Manuel's carpal tunnel syndrome. In moving to strike the testimony, Millry Mill asserted that Dr. Fleet and Dr. Ray were not qualified to give an opinion regarding the cause of Manuel's neck injury and that their testimony was speculative.
The trial court, in its judgment, stated that "all of the medical witnesses whose deposition testimony has been entered into the Record . . . are qualified to testify as expert witnesses on the matters to which they testified," and it stated that the challenge to Dr. Ray's testimony "has been rejected." Therefore, the record indicates that the trial court explicitly denied the motion to strike Dr. Ray's testimony and implicitly denied the motion to strike Dr. Fleet's testimony.
"`A trial court has great discretion in determining the admissibility of evidence, *Page 517 
and its rulings will not be reversed on appeal absent an abuse of discretion.'" Mock v. Allen, 783 So.2d 828, 835
(Ala. 2000) (quoting Grayson v. Dungan, 628 So.2d 445,447 (Ala. 1993)).
 "`The standard of review applicable to whether an expert should be permitted to testify is well settled. The matter is "largely discretionary with the trial court, and that court's judgment will not be disturbed absent an abuse of discretion." Hannah v. Gregg, Bland Berry, Inc., 840 So.2d 839, 850
(Ala. 2002). We now refer to that standard as a trial court's "exceeding its discretion." . . . However, the standard itself has not changed.'"
Prowell v. Children's Hosp. of Alabama,949 So.2d 117, 130 (Ala. 2006) (quoting Kyser v. Harrison,908 So.2d 914, 918 (Ala. 2005)).
Millry Mill argues that Dr. Ray's and Dr. Fleet's testimony is inadmissible under the standard established in Frye v.United States, 293 F. 1013 (D.C. Cir. 1923), concerning the admissibility of scientific evidence. The Frye standard provides that "a person who offers an opinion as a scientific expert must prove that he relied on scientific principles, methods, or procedures that have gained general acceptance in the field in which the expert is testifying." Slay v. KellerIndus., Inc., 823 So.2d 623, 626 (Ala. 2001). However, Dr. Fleet's and Dr. Ray's testimony regarding the cause of Manuel's neck injury was not "scientific" within the meaning of theFrye standard. Dr. Fleet's and Dr. Ray's testimony was not based on scientific tests or procedures; it was instead based on their own experience, knowledge, and expertise as physicians. Accordingly, the Frye standard of admissibility is inapplicable. See Courtaulds Fibers, Inc.v. Long, 779 So.2d 198, 202 (Ala. 2000) (stating that a veterinarian's expert testimony regarding the death of a horse derived from his knowledge, skill, and training and was not subject to the Frye standard); see also Minor v.State, 914 So.2d 372, 400 (Ala.Crim.App. 2004) ("TheFrye test . . . applies only to the admissibility of novel scientific evidence based on scientific tests or experiments."), and cases cited therein (914 So.2d at 400-01).
Rule 702, Ala. R. Evid., governs the admissibility of the expert testimony in this case. That rule provides:
 "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
Rule 702, Ala. R. Evid.
 "`"[T]he criterion for admission of expert testimony is that the witness, by study, practice, experience or observation as to the particular subject, should have acquired a knowledge beyond that of ordinary witnesses."
 "`". . . To qualify as an expert a witness does not have to be shown to be infallible or possessing the highest degree of skill."
 "`". . . .'
 "Kitchens v. State, 31 Ala.App. 239, 241, 14 So.2d 739, 741 (1943) (citation omitted). . . ."
Knapp v. Wilkins, 786 So.2d 457, 461 (Ala. 2000).
Millry Mill argues that the trial court erred in admitting Dr. Ray's testimony regarding the causation of Manuel's neck injury because, Millry Mill says, Dr. Ray is not qualified to give an expert opinion on that issue. In making that argument, Millry Mill cites Dr. Ray's testimony indicating that he could recall examining *Page 518 
only one patient who had the exact same type of neck injury that Manuel sustained. However, the record indicates that Dr. Ray possesses specialized knowledge that would assist the trial court in resolving the causation issue. Dr. Ray has been employed as a orthopedic surgeon for more than 40 years, and he also serves as an associate professor of orthopedic surgery at the University of South Alabama. We conclude that the trial court did not exceed its broad discretion in concluding that Dr. Ray was qualified to provide expert testimony regarding the cause of Manuel's neck injury.
Millry Mill also argues that the trial court erred in admitting Dr. Fleet's and Dr. Ray's opinion testimony regarding the cause of Manuel's neck injury because, Millry Mill says, those opinions are based on speculation and conjecture. We acknowledge that the "[t]he opinions of an expert witness may not rest on `mere speculation and conjecture.'" Dixon v. Board of Water Sewer Comm'rs of Mobile, 865 So.2d 1161, 1166
(Ala. 2003) (quoting Townsend v. General Motors Corp.,642 So.2d 411, 423 (Ala. 1994)). However, "[i]t is well settled that any challenge to the facts upon which an expert bases his opinion goes to the weight, rather than the admissibility, of the evidence. Dyer v. Traeger, 357 So.2d 328, 330
(Ala. 1978)." Baker v. Edgar, 472 So.2d 968, 970
(Ala. 1985). See also Fort James Operating Co. v.Kirklewski 893 So.2d 434, 439 (Ala.Civ.App. 2004);Independent Life Accident Ins. Co. v.Harrington, 658 So.2d 892, 898 (Ala. 1994); and AlabamaPower Co. v. Courtney, 539 So.2d 170, 173 (Ala. 1988). Accordingly, the trial court did not exceed its discretion in admitting Dr. Fleet's and Dr. Ray's testimony over Millry Mill's objections that their conclusions were based on speculation and conjecture.
 C.
We next address Millry Mill's issue I: "Whether the trial court erred in not granting summary judgment on the issue of whether Manuel's injuries were compensable under the Act?"
 "`[W]e do not review a trial court's denial of a summary-judgment motion following a trial on the merits. See Grayson v. Hanson, 843 So.2d 146
(Ala. 2002); Superskate, Inc. v. Nolen, 641 So.2d 231, 233 (Ala. 1994); see also Lind v. United Parcel Service, Inc., 254 F.3d 1281, 1283-84 (11th Cir. 2001)."'
Beiersdoerfer v. Hilb, Rogal Hamilton Co.,953 So.2d 1196, 1205 (Ala. 2006) (quoting Mitchell v. Folmar Assocs., LLP, 854 So.2d 1115, 1116 (Ala. 2003)).
Citing Superskate, Inc. v. Nolen, 641 So.2d 231
(Ala. 1994), Millry Mill argues that this case presents an exception to the general rule that an appellate court does not review the denial of a summary-judgment motion after a trial on the merits. In Superskate, our supreme court stated:
 "Ordinarily, any issue as to the denial of the summary judgment motion would be moot, because the sufficiency of the evidence at trial would be the significant question on appeal. However, a movant who conclusively establishes that a summary judgment is appropriate, with no pertinent opposition from the nonmovant, is `entitled to a judgment as a matter of law,' and `[t]he judgment sought shall be rendered forthwith,' Rule 56(c)(3), Ala. R. Civ. P. . The denial of a summary judgment is not appealable, and if the trial court refuses to issue the statement provided for by Rule 5(a), Ala. R.App. P. (relating to appeals by permission), the movant has no opportunity for review other than an appeal after an adverse judgment. Therefore, it is at least arguable that the later *Page 519 
appeal could challenge the correctness of the denial of a summary judgment.
 "Furthermore, in this case, the plaintiffs' evidence in opposition to the summary judgment motions was somewhat different from their evidence at trial, so the question of sufficiency differs at the two stages. To say that a judgment should have been entered against the plaintiff for failure at an early stage to produce sufficient probative evidence may be an exaltation of form over substance where the plaintiff has produced sufficient evidence at trial. On the other hand, if it appears that the plaintiff has changed testimony or other evidence based on experience gained during the proceedings on the motion for summary judgment, the defendant may have a legitimate argument that the case should never have gone to trial."
641 So.2d at 233-34 (footnote omitted).
Millry Mill contends that Manuel changed his testimony between the filing of the motions for a partial summary judgment and the trial. In moving for a partial summary judgment, Millry Mill submitted excerpts from Manuel's 2002 deposition testimony, in which he testified that he did not remember experiencing pain in his neck while working for Millry Mill. In opposing the summary-judgment motions, Manuel presented additional excerpts from his 2002 deposition, in which he testified that he experienced pain in his neck while working for Millry Mill. At trial in 2006, Manuel testified that he began to experience pain in his neck while "flipping boards" at work. At trial, Manuel testified that he was experiencing pain and was on medication at the time of his 2002 deposition. It was the function of the trial court, as the finder of fact, to determine the credibility of Manuel's testimony and to assign relative weight to that testimony. See Van Hoof v. Van Hoof, 997 So.2d 278, 286
(Ala. 2007). Regardless of Manuel's testimony, the trial court had before it sufficient evidence to support its finding that Manuel's neck injury was compensable under the Act. Our supreme court has stated: "We caution that it would be a rare case where this Court would reverse the denial of a summary judgment when the nonmovant has produced sufficient evidence at trial to survive a [motion for a judgment as a matter of law]."Superskate, 641 So.2d at 234. We conclude that this is not the rare case contemplated by Superskate in which we would reverse the denial of a summary-judgment motion after a trial on the merits.
 D.
We next address Millry Mill's issue IV: "Whether the trial court erred in assessing costs against Millry Mill?" Section 25-5-89, Ala. Code 1975, provides, in part, that "[c]osts may be awarded by [the trial] court in its discretion, and, when so awarded, the same costs shall be allowed, taxed and collected as for like services and proceedings in civil cases." "`[W]here a cost is not substantiated by an "invoice or other evidence," this court has held that a trial court abused its discretion in awarding the prevailing employee payment of that cost.'"Reeves Rubber, Inc. v. Wallace, 912 So.2d 274, 281-82
(Ala.Civ.App. 2005) (quoting Bostrom Seating, Inc. v.Adderhold, 852 So.2d 784, 799 (Ala.Civ.App. 2002), citing in turn Hooker Constr., Inc. v. Walker, 825 So.2d 838,845 (Ala.Civ.App. 2001)). The record contains no invoices or other evidence to substantiate Manuel's costs. Accordingly, we conclude that the trial court's judgment is due to be reversed insofar as it awards Manuel costs in the amount of $11,751.65; however, we except from our conclusion in this regard the filing fee in the amount of $210 because a trial court may take judicial notice *Page 520 
of that cost. See Bostrom Seating, Inc. v. Adderhold,852 So.2d at 799.
Manuel contends that Millry Mill is precluded from challenging the award of costs because, he contends, Millry Mill conceded that it owed the costs. Manuel argues that Millry Mill implicitly made this concession by moving the trial court to set a supersedeas bond in an amount that accounted for the amount of costs awarded in the judgment. We do not read Millry Mill's motion for a supersedeas bond as a concession precluding it from arguing on appeal that the trial court erred in awarding certain costs. Manuel also argues that Millry Mill stipulated that it owed the awarded costs in a letter from Millry Mill's attorney to Manuel's attorney. However, because the record does not contain a copy of that letter, we may not consider the letter's purported contents. See Grider v. Grider,578 So.2d 1363, 1364 (Ala.Civ.App. 1991) ("An appellate record cannot be factually enlarged or altered by factual allegations found in a party's brief."). The record does not indicate that Millry Mill conceded that it owed the full amount of the costs awarded by the trial court.
 E.
In addition to the issues enumerated in its brief, Millry Mill also argues that the trial court should have treated Manuel's carpal tunnel syndrome as a permanent partial disability under the schedule provided in § 25-5-57(a)(3), Ala. Code 1975. However, Millry Mill never presented this argument to the trial court. "[An appellate court] cannot consider arguments advanced for the purpose of reversing the judgment of a trial court when those arguments were never presented to the trial court for consideration or were raised for the first time on appeal."State Farm Mut. Auto. Ins. Co. v. Motley,909 So.2d 806, 821 (Ala. 2005). We note also that the trial court found that, regardless of Manuel's carpal tunnel syndrome, Manuel was permanently and totally disabled as a result of the injury to his neck, a body part not listed in the schedule.
 F.
On application for rehearing, Millry Mill maintains that, on original submission, it argued that, even if the injury did not fall within the schedule provided in § 25-5-57(a)(3), Manuel's carpal tunnel syndrome had failed to render him permanently and totally disabled. In its principal brief, Millry Mill asserts, without developing further argument, that "Mr. Manuel has not met his burden of proof with regards to [his carpal tunnel syndrome] being permanent." Millry Mill's brief at 65. In its reply brief, Millry Mill maintains that there was insufficient evidence establishing that Manuel "is permanently and totally disabled by the carpal tunnel syndrome," and it follows that assertion with supporting evidence. Millry Mill's reply brief at 25. We do not address whether Millry Mill has sufficiently presented and argued whether Manuel's carpal tunnel syndrome rendered him permanently and totally disabled because the trial court found that, regardless of Manuel's carpal tunnel syndrome, Manuel was permanently and totally disabled as a result of his neck injury. Accordingly, we pretermit further discussion of this issue.
 Conclusion
We reverse the judgment of the trial court insofar as it awarded Manuel costs in excess of the filing fee in the amount of $210, and we remand the case. In all other respects, we affirm the judgment.
APPLICATION FOR REHEARING GRANTED; OPINION OF NOVEMBER 30, 2007, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; *Page 521 
REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and THOMAS, J., concur.
PITTMAN, J., concurs specially.
MOORE, J., recuses himself.
[1] A "board foot" is "a unit of quantity for lumber equal to the volume of a board 12 X 12 X 1 inches." Merriam-Webster'sCollegiate Dictionary 137 (11th ed. 2003).
[2] The record on appeal indicates that the annulus is a ring of fibrous tissue that wraps around the disks of the neck.
[3] Carpal tunnel syndrome may also be caused by a one-time acute trauma or accident. In such a case, the proper burden of proof is the preponderance of the evidence. Ex parte USXCorp., 881 So.2d 437, 441-43 (Ala. 2003). In this case, we understand the trial court's judgment as finding that both Manuel's carpal tunnel syndrome and his neck injury were caused by gradual deterioration or cumulative physical stress.